RESIDENTIAL CARPENTRY, INC., Plaintiff-Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Douglas Tibbitts, Appellee).

Third District (Illinois Workers' Compensation Commission Division)

No. 3—08—0122WC

Opinion filed May 8, 2009.

Jeffrey Corso, of Cooney Corso, LLC, of Lisle, for appellant.

James McPhedran, of Anthony Raccuglia & Associates, of Peru, for appellee.

JUSTICE HUDSON delivered the opinion of the court:

Claimant, Douglas Tibbitts, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS

305/1 *et seq.* (West 2002)). He alleged that he sustained an injury to his shoulder resulting from a work-related incident. The arbitrator found claimant credible and awarded him 28 weeks' temporary total disability (TTD), existing and prospective medical expenses, as well as penalties and attorney fees. The Workers' Compensation Commission (Commission) adopted the decision of the arbitrator, and the circuit court of Will County confirmed its decision. Respondent, Residential Carpentry, Inc., now appeals, raising two issues. First, it argues that claimant was not entitled to TTD. Second, it asserts that the Commission erred in imposing penalties and fees. We disagree and affirm. The arbitrator did defer ruling upon penalties and fees with respect to prospective expenses, so we remand for that determination as well as for further proceedings pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327 (1980).

Before proceeding further, we note that claimant requests that this court impose sanctions under Supreme Court Rule 375 (155 Ill. 2d R. 375). The imposition of sanctions under this rule is a matter "left strictly to our discretion." *Fields v. Lake Hillcrest Corp.*, 335 Ill. App. 3d 457, 466 (2002). Claimant asserts that sanctions would "hopefully minimize the need for injured workers to have to endure this process to this extent in the future." We believe the fees and penalties imposed by the Commission adequately protect that interest. Hence, in exercise of the discretion we possess regarding this issue, we reject claimant's request.

## I. BACKGROUND

Claimant was employed by respondent as a "back-out" carpenter. His job involved building wooden structures, such as door frames, soffits, and dropped ceilings. It also included lifting prefabricated stairs into place, which weighed over 100 pounds. Claimant worked part-time between April 2001 and October 2004 in a window-washing business as well. He was injured on October 13, 2003, when he tore his rotator cuff. Claimant's right shoulder also suffers from two additional conditions—spurring of the distal clavicle and arthritis.

Claimant testified that, on October 13, 2003, he was lifting some stairs and noticed a sharp pain in his shoulder. He thought he had "pulled a muscle." The pain became worse that evening, and claimant had difficulty sleeping that night. The next day, claimant informed his foreman of the injury, and they filled out an accident report. Claimant stated that he had never experienced this sort of pain prior to this time. Claimant sought medical treatment from Dr. Analytis. Analytis ordered an MRI and referred claimant to Dr. Rezin. Rezin recommended starting with conservative treatment, specifically cortisone

shots and physical therapy. Rezin did not place any restrictions upon claimant's ability to work at this time.

Claimant testified that he participated in physical therapy from January 2004 to March 2004. He noted a "slight improvement." Rezin eventually recommended surgery. Claimant stated that respondent refused to authorize the procedure.

On June 9, 2004, claimant was again lifting a set of stairs. He aggravated his shoulder and reported it to his foreman. Claimant sought care at an emergency room. An emergency room doctor told him to not work until he saw Rezin. Claimant was examined by Rezin on June 15, 2004. Rezin imposed some work restrictions, which respondent honored.

In December 2005, however, claimant was laid off. Claimant unsuccessfully attempted to be rehired by respondent. He also attended regular union meetings in an effort to secure employment. On March 8, 2006, claimant had a conversation with Dan Engel, respondent's superintendent. Engel told claimant that they were not busy, that there were problems on claimant's last job, and that claimant would be "better off to seek employment somewhere else." Claimant characterized Engel's manner of speaking as a tirade. Claimant stated that he was unaware of any problems with his last job. Claimant tried to obtain a position with 15 to 20 other contractors, and he kept a log documenting his efforts.

Claimant testified that there had been no changes with regard to the restrictions he was under since he saw Rezin in September 2005. Rezin's recommendation that claimant undergo surgery also had not changed. Claimant testified that he had not had the surgery solely because respondent refused to authorize it. He still experienced a "constant dull ache" in his shoulder. Overhead activity causes him "sharp pain and a lot of popping in the shoulder joint." Claimant testified that his symptoms have been "pretty much the same" since the incident on October 13, 2003.

During cross-examination, claimant acknowledged that between October 2003 and December 2005, he never missed work due to his injury. Claimant stated that he would help out in his window-washing business in May and November, which were usually busy periods. Claimant also acknowledged that he had some "aches and pains" in his shoulder prior to October 13, 2003. On redirect, claimant testified that he never injured himself while washing windows.

Bruce Elmer, respondent's safety director, testified for respondent. In his position as safety director, Elmer oversees workers' compensation claims. Elmer testified that respondent did have a light-duty program. Respondent tried to return injured employees to work as soon as possible, consistent with their limitations.

Elmer was aware of claimant's accident of October 13, 2003. Elmer stated that it was normal for an employee to give his restricted-duty slips to his foreman. The slips eventually make their way to Elmer, who reviews them to see if respondent can provide work within the restrictions. Neither claimant's foreman nor his superintendent discussed claimant's situation with Elmer. Claimant never contacted Elmer either. Elmer explained that he did not make the decision regarding whether the company needed to hire more people. Rather, a superintendent would make a decision to start hiring, and then, if someone was available for a light-duty position and such a position was consistent with the needs of the company, Elmer would try and place the person in the position. According to Elmer, the company currently had some light-duty jobs available. Elmer stated that if claimant had contacted him and informed him that he was available for light duty, Elmer would have attempted to find out why claimant was not being recalled to work.

During cross-examination, Elmer testified that he was aware that claimant was working light-duty from September 2005 until the time he was laid off. Elmer acknowledged that he did not check to see why claimant was not being brought back to work despite having a restricted-duty slip in his office dated March 28, 2006. He stated that he did not know why claimant was off work.

Respondent also called Barry Bukeloo. Bukeloo is a private detective. In December 2003, he was hired by WRAMSCO (respondent's workers' compensation insurance carrier) to obtain an interview of claimant and his foreman. Claimant told Bukeloo that he had no other job when Bukeloo asked him about secondary employment. Claimant also did not mention that he had been involved in an automobile accident in the past. Subsequently, Bukeloo conducted an investigation and discovered claimant had a window-washing business. During cross-examination, Bukeloo acknowledged that he actually asked claimant about secondary employment rather than a secondary source of income or whether claimant owned a business. He further acknowledged that he only asked claimant if he had a prior shoulder injury and not whether he had been involved in a prior accident. Claimant responded that he had previously hurt his shoulder, but that it had fully resolved prior to his current injury.

Dr. Analytis, one of claimant's treating physicians, testified via evidence deposition. Claimant came to see Analytis in October 2003 with a shoulder injury. Analytis prescribed an anti-inflammatory medication and ordered an MRI, which was performed on October 21, 2003. The MRI revealed fluid in claimant's shoulder and a partial tear of his rotator cuff. Fluid collection is indicative of an acute injury. The

MRI also revealed degenerative changes to the acromioclavicular joint, which Analytis described as "erosion of the bone." It further showed "mild inferior spurring of the distal clavicle." Spurring, according to Analytis, "is sort of like calcium deposits." Spurring is not "brought about acutely," but occurs "over a long period of time." However, the condition can be aggravated by an acute incident. Analytis referred claimant to Dr. Rezin. During cross-examination, Analytis explained that claimant had experienced some shoulder pain prior to the incident in October 2003, but that his condition worsened following that incident. Analytis opined that lifting the stairs was causally related to claimant's injury.

Claimant also submitted the evidence deposition of Dr. Keith Rezin. Rezin first saw claimant regarding his shoulder injury on November 5, 2003. Claimant told Rezin that he was lifting some stairs and developed pain in his right shoulder. Claimant had already had X rays taken and had undergone an MRI. The MRI showed an "incomplete rotator cuff tear" and "AC joint arthritis." Rezin opined that the condition of claimant's rotator cuff was causally related to the incident at work that occurred on October 13, 2003. Rezin also stated that AC joint arthritis can be aggravated by a trauma related to lifting and that claimant's arthritis had been aggravated in this manner. Rezin initially recommended a conservative course of treatment. After that course failed to improve claimant's condition, Rezin recommended surgery, specifically "a shoulder arthroscopy with a decompression and possible distal clavicle resection."

In a visit on June 14, 2004, claimant reported that he had reinjured his shoulder, again lifting stairs. Claimant also informed Rezin that respondent had only approved part of the surgery. Rezin maintained his recommendation for surgery. Rezin also placed some lifting restrictions upon claimant pending surgery, which remain in place. Rezin clarified that this lifting incident may have aggravated claimant's condition, but he would be recommending surgery regardless of whether it occurred. Additionally, Rezin testified that the fact that claimant experienced some aches and pains in his shoulder prior to October 13, 2003, would not change his opinion.

During cross-examination, he agreed that it was possible that a tear in one's rotator cuff could arise through degenerative means. He also stated that, with regard to the decompression of claimant's shoulder and the rotator cuff repair, "[y]ou do both of those," because "they kind of go hand in hand." However, an AC joint resection is for a different condition. Nevertheless, a resection can be related to a rotator cuff tear if there are spurs on the undersurface of the distal clavicle. Whether the conditions are related cannot be determined

solely by an MRI. Rezin stated that spurring would not be caused by an acute mechanism, at least in the short term. At another point in his testimony, the following exchange took place:

"Q. Okay. Thank you

Now, the distal clavicle surgery has nothing to do *** with the torn rotator cuff, your recommending surgery on the distal clavicle, correct?

A. I think it can, because if there is an injury or spurs that are impinging on the rotator cuff or the supraspinatus, which is part of your rotator cuff, it can have an effect on the tendon itself.

Q. But, Doctor, you don't know by looking at this MRI that that's the case with this particular patient, correct?

A. No, one can infer that it is because he has some spurs there on the inferior aspect of the clavicle, but there's no way to really know sometimes until you get in there."

Regarding the AC resection, Rezin opined that it was "more related to the arthritis," but he believed that its "inferior spurs" could "have an effect on the rotator cuff tear." Rezin did agree that he could not definitively tell what the causes were of claimant's various conditions until he performed surgery.

During redirect examination, Rezin opined that the degenerative changes in claimant's shoulder remained asymptomatic until they were aggravated by the acute incident on October 13, 2003. Similarly, an arthritic condition can be aggravated, which was what Rezin believed had occurred in this case.

Dr. Scott Betzelos examined claimant on respondent's behalf. He opined that claimant suffered from three conditions: impingement syndrome; a rotator cuff tear, and degenerative arthritis. Betzelos believed that the first condition was unrelated to claimant's accident of October 13, 2003, and that the "main culprit" behind claimant's arthritis was his window-washing business. He also stated that clavicular spurring "may represent old post traumatic changes."

The arbitrator awarded claimant 28 weeks' TTD at a rate of $740.76 per week. 820 ILCS 305/8(b) (West 2002). He also ordered respondent to pay reasonable medical expenses and approve the surgical procedure recommended by Rezin. Finally, the arbitrator imposed penalties and fees for its refusal to approve of that surgery. See 820 ILCS 305/16, 19(k), 19(l) (West 2002). He reserved ruling on a portion of the amount of fees and penalties until after claimant's surgery. In the course of resolving the matter, the arbitrator expressly found credible the testimony of claimant, Rezin and Analytis. He noted claimant's testimony was consistent with an earlier statement taken by respondent shortly after the accident. The arbitrator also found

relevant portions of the testimony of Betzelos "not persuasive." Notably, the surgery ordered by the arbitrator would address all three aspects of claimant's difficulty with his shoulder. The Commission adopted the arbitrator's decision, and the circuit court of Will County confirmed.

## II. ANALYSIS

Before this court, respondent presses two issues. First, it argues that the Commission erred in awarding TTD because claimant actually worked for 25 months following his injury and was actually laid off due to economic rather than medical reasons. Second, it asserts that the Commission should not have awarded penalties and fees since its refusal to approve the surgery recommended by Rezin does not constitute bad faith.

### A. Temporary Total Disability

An injured employee is entitled to TTD from the time an injury incapacitates him from working until the time the employee is recovered to the point that the permanent character of the injury will permit. *Mobil Oil Corp. v. Industrial Comm'n*, 327 Ill. App. 3d 778, 789 (2002). An employee is no longer entitled to TTD once the condition stabilizes. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118 (1990). To be entitled to TTD, a claimant must show not only that he did not work but that he could not work. *Archer Daniels Midland Co.*, 138 Ill. 2d at 119. That a claimant can earn some wages or perform some useful services on occasion does not preclude an award of TTD. *Freeman United Coal Mining Co. v. Industrial Comm'n*, 318 Ill. App. 3d 170, 179 (2000).

■ In this case, the dispute is not over whether claimant's condition has stabilized; rather, the issue is whether claimant's condition renders him totally disabled. Respondent points out that claimant worked his regular job for 25 months prior to being laid off. Indeed, claimant was laid off on November 30, 2005, which was about 25 months after the October 13, 2003, incident where claimant was first injured. However, after claimant was examined by Rezin on June 15, 2004, Rezin imposed some work restrictions, which respondent honored. Claimant continued to work until he was laid off. Thus, during the final 17 months that claimant was employed by respondent, claimant worked less than full duty. That claimant was able to work in some capacity despite his condition means claimant was not obviously unemployable, so claimant had to establish that there was no employment available to a person in his condition. *Archer Daniels Midland Co.*, 138 Ill. 2d at 120-21.

To this end, claimant provided evidence of a diligent search for employment. *Archer Daniels Midland Co.*, 138 Ill. 2d at 122. He testified that he remained in contact with his union to see if it could secure him another position and that he sought to be reemployed by respondent. Additionally, claimant contacted between 15 and 20 other potential employers, but found no job. Claimant produced a log documenting his efforts. Evidence of a diligent search for employment is sufficient to show that claimant was not employable. See *Archer Daniels Midland Co.*, 138 Ill. 2d at 122. Thus, claimant has fulfilled this burden, and it was for respondent to show that claimant was otherwise employable during this period.

This respondent did not do. It has been held that the mere fact that a claimant is capable of light-duty work does not preclude an award of TTD. See *Ford Motor Co. v. Industrial Comm'n*, 126 Ill. App. 3d 739, 743 (1984) ("Neither the ability to do light work nor the nonreceipt of medical treatment, as argued by Ford, preclude a finding of temporary total disability"). Accordingly, that claimant worked under a medical restriction from June 15, 2004, until November 30, 2005, does not establish that claimant was otherwise employable. This is particularly true in light of claimant's diligent attempts to find work.

Respondent claims that it laid off claimant for economic reasons. Initially, we note that this does not preclude a TTD award. In *Whitney Productions, Inc. v. Industrial Comm'n*, 274 Ill. App. 3d 28, 31 (1995), this court, in affirming an award of TTD, observed:

> "Here claimant worked from the date of his accident until he was laid off. During this time, the condition of claimant's hand necessitated the modification of his working habits. Claimant no longer could operate a forklift, lift boxes, or load trucks. And, once he sought medical treatment, claimant was either restricted to light duty work or to not working at all. Throughout the entire period, claimant continued to experience pain and swelling in his hand and had limited gripping ability."

Similarly, in this case, during the time claimant worked, it became necessary for Rezin to impose restrictions upon claimant's ability to work after the second incident, which occurred in June 2005. Just as in *Whitney Productions*, claimant's pain never resolved during this period. Thus, we also hold that the fact that claimant continued to work did not prevent the Commission from concluding that claimant was temporarily totally disabled.

Finally, respondent contends that claimant's own testimony establishes that he was laid off for economic reasons. Specifically, claimant testified at two points that when he contacted respondent

and asked if he was going to be rehired, he was told that respondent was "not busy." We do not believe that this testimony conclusively establishes that claimant was laid off for economic reasons, even if that were the dispositive consideration. According to claimant, one of the individuals who told them respondent was not busy then went "into a tirade" and accused him of not performing properly on the last job he did for respondent. Claimant, whom the Commission found credible, testified that he was unaware of any problems with his last job. This, in turn, permits an inference that respondent was not being forthcoming when it told claimant it had no work for him. Since respondent's claim that it was not busy was part of this exchange, the Commission was not required to take it at face value.

To conclude this section, we find respondent's argument unpersuasive. Claimant, though not obviously totally disabled, did present evidence of a diligent and unsuccessful job search. Respondent points to nothing to rebut this evidence. We therefore affirm this portion of the Commission's decision.

## B. Fees and Penalties

■ Respondent next complains of the Commission's decision to award claimant attorney fees and penalties under various sections of the Act. See 820 ILCS 305/16, 19(k), 19(l) (West 2002). Specifically, the Commission awarded penalties pursuant to sections 19(k) and 19(l) of the Act for respondent's failure to authorize claimant's surgery as well as for respondent's failure to pay TTD. Similarly, the Commission awarded $5,295.62 under section 16 for attorney fees with reference to respondent's failure to pay existing medical expenses, approve the surgery and pay TTD. Respondent limits its challenge to the Commission's awards pursuant to section 16 and section 19(k). Whether to impose additional compensation under these provisions is a factual question subject to the manifest-weight standard of review. *Mechanical Devices v. Industrial Comm'n*, 344 Ill. App. 3d 752, 763 (2003).

The standards under section 16 and section 19(k) are similar. Both require an unreasonable or vexatious delay in payment. *Vulcan Materials Co. v. Industrial Comm'n*, 362 Ill. App. 3d 1147, 1150 (2005). Typically, "an employer's reasonable and good-faith challenge to liability ordinarily will not subject it to penalties under the Act." *Matlock v. Industrial Comm'n*, 321 Ill. App. 3d 167, 173 (2001). Where an employer is in possession of facts that would justify a denial of benefits, penalties and fees are generally inappropriate. *Electro-Motive Division v. Industrial Comm'n*, 250 Ill. App. 3d 432, 436 (1993). Good faith must be assessed objectively; thus the question is whether an employer's denial of benefits was reasonable. *Electro-Motive Division*,

250 Ill. App. 3d at 436. The employer bears the burden of demonstrating that its denial of benefits was reasonable. *Electro-Motive Division*, 250 Ill. App. 3d at 436. With these standards in mind, we turn to respondent's argument.

Respondent contends that the sole reason that the Commission imposed penalties and fees was that it refused to authorize claimant's surgery. It asserts, however, that its refusal was reasonable under the circumstances because a portion of the condition of claimant's shoulder was not related to his employment. Respondent points out that it did authorize the repair of claimant's rotator cuff, and it only denied authorization for the clavicle resection portion of the surgery.

Respondent flatly states that "[t]here is no evidence in the record that the bone spurring [to the distal clavicle] was caused by or aggravated by a either workplace accident [sic]." This is simply incorrect. Rezin testified that it was inferable from claimant's MRI that the spurs on claimant's distal clavicle were impinging upon his rotator cuff. Prior to the incident of October 13, 2003, the spurs did not impinge upon claimant's rotator cuff, and it is pure speculation whether they would have ever necessitated surgery. Moreover, Rezin also opined that degenerative changes in claimant's shoulder had remained asymptomatic until they were aggravated by an acute incident on October 13, 2003. The aggravation of a preexisting condition is, of course, compensable under the Act. *Federal Marine Terminals, Inc. v. Illinois Workers' Compensation Comm'n*, 371 Ill. App. 3d 1117, 1130 (2007).

The Commission, adopting the reasoning of the arbitrator, expressly found that respondent's suggestion that claimant "try and have a doctor perform surgery on a rotator cuff repair [sic] but not on the clavicle when the clavicle is also in need of surgery" was not reasonable. Indeed, claimant had problems with his shoulder. A work-related accident caused additional injuries and exacerbated the condition of his shoulder. Rezin recommended a surgery that would include a shoulder arthroscopy with a decompression and a possible distal clavicle resection. The arbitrator correctly observed that it would not be reasonable to have a doctor operate on one part of claimant's shoulder, but not on another part that could be addressed during the same procedure. In essence, it was not reasonable for respondent to attempt to subdivide a region of claimant's body in a manner contrary to how it would be treated in the normal course of medical practice. Given the state of the record, most notably Rezin's testimony that the conditions were related, we cannot say that the Commission's decisions to award claimant fees and penalties were against the manifest weight of the evidence.

## III. CONCLUSION

In light of the foregoing, the decision of the circuit court of Will County confirming the decision of the Commission is affirmed. This cause is remanded to the Commission for a determination of appropriate additional fees and penalties, if any (which the arbitrator reserved ruling upon), as well as further proceedings pursuant to *Thomas*, 78 Ill. 2d 327.

Affirmed and remanded.

McCULLOUGH, P.J., and HOFFMAN, HOLDRIDGE, and DONOVAN, JJ., concur.