# Illinois Official Reports

## Appellate Court

*Village of Deerfield v. Illinois Workers' Compensation Comm'n*,
2014 IL App (2d) 131202WC

| | |
|---|---|
| Appellate Court Caption | VILLAGE OF DEERFIELD, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Hugh Garrity, Appellee). |
| District & No. | Second District<br>Docket No. 2-13-1202WC |
| Filed | December 23, 2014 |
| Rehearing denied | January 21, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a workers' compensation proceeding where claimant was injured in two accidents, the first injuring his left and right shoulders, and the second injuring his neck and lumbar spine, and the first accident resulted in permanent partial impairment and the award of permanent partial disability of 18.8% of the person-as-a-whole under section 8(d)(2) of the Workers' Compensation Act, and the second accident resulted in claimant being unable to return to his regular employment and an award of a wage differential under section 8(d)(1) of the Act due to the impairment of his earning capacity, the decision of the Illinois Workers' Compensation Commission to make separate awards for injuries to different body parts in separate accidents was properly confirmed by the trial court, since the Commission's decision was not contrary to the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 13-MR-623; the Hon. Jorge L. Ortiz, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

W. Britton Isaly, of Ancel Glink Diamond Bush DiCianni & Krafthefer, PC, of Chicago, for appellant.

Richard D. Hannigan, of Hannigan & Botha, Ltd., of Mundelein, for appellee.

Panel

JUSTICE STEWART delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    The claimant, Hugh Garrity, filed three applications for adjustment of claim against his employer, the Village of Deerfield, seeking workers' compensation benefits. In the first application the claimant alleged that on February 28, 2005, he injured his left shoulder while throwing a scrap light pole into a truck. In the second application he alleged that on August 9, 2005, he injured his cervical and lumbar spine while driving a lawn tractor. In his third application the claimant alleged that on January 12, 2006, he aggravated his left shoulder, left trapezius, and his neck while pulling holiday lights. The claims were consolidated and proceeded to an arbitration hearing under the Workers' Compensation Act (the Act) (820 ILCS 305/1 (West 2004)). The arbitrator found that the claimant did sustain an accident on February 28, 2005, that arose out of and in the course of his employment and that his condition of ill-being was causally related to the accident. The employer was ordered to pay the claimant $567.87 per week for 93.95 weeks, as provided in section 8(e)(10) of the Act, because the injuries sustained caused 25% loss of use of the left arm and 15% loss of use of the right arm. The arbitrator found that the claimant did sustain an accident on August 9, 2005, that arose out of and in the course of his employment and that his condition of ill-being was causally related to the accident. He found that the claimant's work injury of August 9, 2005, resulted in him being incapacitated from pursuing his usual and customary line of employment as contemplated in section 8(d)(1) of the Act. The employer was ordered to pay the claimant a wage differential commencing October 16, 2011, of $694.73 per week for the duration of the disability because the injuries sustained caused loss of earnings as provided in section 8(d)(1) of the Act. The arbitrator found that the claimant did sustain an accident on January 12, 2006, that arose out of and in the course of his employment, but that the claimant's condition of ill-being was not causally related to the accident.

¶ 2    The employer appealed to the Illinois Workers' Compensation Commission (Commission). In accordance with the holding in *Will County Forest Preserve District v. Illinois Workers' Compensation Comm'n*, 2012 IL App (3d) 110077WC, the Commission held that when a claimant sustains a work-related injury to the shoulder, benefits are proper under section 8(d)(2). The Commission modified the arbitrator's decision with respect to the permanent partial disability benefits awarded for the claimant's left and right shoulders. The Commission converted the permanent disability award to a person-as-a-whole award under section 8(d)(2). The Commission otherwise affirmed and adopted the arbitrator's decision. The employer filed a timely petition for review in the circuit court of Lake County which confirmed the Commission's decision. The employer appeals.

¶ 3                                    BACKGROUND

¶ 4    The following factual recitation is taken from the evidence presented at the arbitration hearing conducted on December 19, 2011. The claimant asked that the three cases be consolidated for convenience and requested that separate decisions be written on each claim. The employer did not object and the arbitrator granted the request.

¶ 5    The claimant testified that on September 15, 1981, he started working for the employer as a maintenance operator. On February 28, 2005, the claimant injured his left shoulder while he was loading a scrap light pole onto a truck. On March 2, 2005, he was examined at the employer's health clinic, Omega Healthcare. In the clinic's progress notes, the examiner noted that the claimant was injured when lifting some old, removed streetlight poles onto a truck. He was diagnosed with a left shoulder sprain. The claimant was restricted from using his left arm and driving the company vehicle. The claimant was instructed to return in five days for further evaluation.

¶ 6    The claimant returned to Omega Healthcare on March 7, 2005. He reported that he still had discomfort in his anterior shoulder. The claimant was diagnosed with shoulder strain. The claimant was restricted from lifting more than 10 pounds with his left arm and from driving company vehicles. He was instructed to return in one week. At a follow-up examination on March 14, 2005, the claimant had improved and his restrictions were modified to assistance with lifting over 50 pounds.

¶ 7    On March 23, 2005, the claimant returned to Omega Healthcare for a follow-up examination. His 50-pound restriction was continued. The progress notes indicate that the claimant "still hurts when he reaches up above his shoulder." The claimant testified that at the time of his release he continued to experience pain and weakness in his left arm and shoulder.

¶ 8    On August 9, 2005, the claimant was driving a lawn tractor and had to duck and twist his body to avoid being struck by a tree branch. He injured his neck and back. He was seen the next day at Omega Healthcare, where he was diagnosed with a cervical and lumbar strain. The claimant was prescribed medication and was restricted from driving, from lifting over 10 pounds, and from bending, twisting or climbing. On August 15, 2005, his lifting restriction was increased to 20 pounds, he was allowed minimal bending and stooping, and he was told he must be able to change position from sitting to standing and moving about as needed. He was restricted from truck or heavy equipment driving or mowing.

¶ 9    The claimant was seen at Omega Healthcare on August 22, 2005, and it was noted that he took himself off work on August 17, 2005. Physical therapy was prescribed to expedite his

rehabilitation. The claimant testified that he was told to avoid repetitive stop-and-go motions with his vehicle, and no lifting over 20 pounds.

¶ 10    The claimant started physical therapy on September 13, 2005. On September 26, 2005, the claimant was examined at Omega Healthcare. The examiner noted that the claimant complained that his physical therapy was not helping, that his range of motion continued to be limited, and that he could not move his neck very well. Due to his slow progress, the claimant was referred to Dr. Martin Lanoff.

¶ 11    Dr. Lanoff examined the claimant on October 18, 2005. Dr. Lanoff diagnosed the claimant with significant tension myalgia and cervicothoracic and lumbar myofacial issues, mostly in the cervical and trapezius regions. He noted that it was secondary to left shoulder impingement. He wrote that the claimant's left shoulder impingement never healed after the first accident. Dr. Lanoff prescribed physical therapy. The claimant began physical therapy on October 31, 2005.

¶ 12    On November 15, 2005, Dr. Lanoff examined the claimant. He noted that the claimant's cervical spine had improved after three weeks of physical therapy, but that his shoulder was worse. The claimant received a subacromial injection. Dr. Lanoff ordered a magnetic resonance imaging scan (MRI) of the left shoulder.

¶ 13    On December 6, 2005, Dr. Lanoff examined the claimant. The claimant complained that he had minimal improvement in therapy. The claimant had left trapezius symptoms, and left shoulder impingement and rotator cuff tendinitis. Dr. Lanoff noted concern about rotator cuff pathology, which he felt might be causing the claimant's cervical discomfort. He averred that it was also possible that cervical neuropathology was causing weakness about the rotator cuff. He stated that it was "a difficult differential diagnosis." Dr. Lanoff recommended an electromyographic evaluation (EMG) of the left upper extremity. He continued the claimant's light-duty restrictions and physical therapy.

¶ 14    On December 8, 2005, Dr. Lanoff wrote in a letter that the claimant's EMG was negative. Based on those results he opined that the claimant's cervical spine was not the source of his symptoms. He gave the claimant another subacromial injection.

¶ 15    At an appointment at Omega Healthcare on December 21, 2005, the examiner noted in the progress report that the claimant complained of continued pain in his shoulder and back.

¶ 16    On January 12, 2006, the claimant aggravated his left shoulder, trapezius, and his neck while removing holiday lights from parkway trees.

¶ 17    On February 2, 2006, Dr. Lanoff examined the claimant, who reported reaching a plateau in physical therapy. The claimant complained of neck and left trapezius shoulder pain. Dr. Lanoff recommended an MR arthrogram of the claimant's left shoulder. On February 7, 2006, the claimant underwent the MR arthrogram, which revealed mild degenerative changes of the AC joint, rotator cuff tendinopathy with a focal partial tear of the anterior ridge of the rotator cuff arising from the articular surface. Dr. Lanoff referred the claimant to his associate, Dr. David Zoellick.

¶ 18    Dr. Zoellick examined the claimant on February 14, 2006. The claimant complained of left shoulder pain. He diagnosed the claimant with a partial thickness rotator cuff tear as well as impingement syndrome which was either caused by or aggravated by work activities. He recommended surgery.

¶ 19    On March 15, 2006, Dr. Zoellick performed a left shoulder rotator cuff repair with an arthroscopic debridement of the labral tear and open acriomioplasty. The claimant followed up with Dr. Zoellick postoperatively, and on July 28, 2006, he was released to light-duty work with no lifting greater than 20 pounds below shoulder height and no overhead lifting.

¶ 20    At a follow-up appointment with Dr. Zoellick on August 24, 2006, the claimant complained of pain in his right shoulder and the right side of his neck. He told Dr. Zoellick that he had been using his right arm more when working. Dr. Zoellick examined the claimant again on September 25, 2006. He noted that the claimant was overcompensating for his left shoulder by excessively using his right shoulder and that he had developed symptoms in the right shoulder. Dr. Zoellick opined that, based upon the claimant's increasing pain in his right shoulder with more activity at work, the right shoulder problem was related to his work injury. Dr. Zoellick released the claimant to full-duty work.

¶ 21    On October 13, 2006, Dr. Zoellick examined the claimant. He diagnosed the claimant with symptoms of right shoulder impingement and possible right rotator cuff tear as well as bilateral carpal tunnel syndrome. Due to persistent right shoulder pain, he recommended an MR arthrogram of the right shoulder.

¶ 22    On November 1, 2006, the claimant had an MR arthrogram of his right shoulder. On November 3, 2006, Dr. Zoellick examined the claimant and diagnosed him with right shoulder impingement syndrome, rotator cuff tendonitis, and AC joint arthritis. Dr. Zoellick gave the claimant a subacrominal steroid injection. No work restrictions were imposed.

¶ 23    Dr. Zoellick examined the claimant on December 4, 2006, January 12, 2007, and February 23, 2007. Because the claimant continued to complain of left shoulder pain and neck pain, Dr. Zoellick ordered an MRI scan of the claimant's cervical spine to rule out cervical disk herniation for both the cause of his neck pain and as a contributor to numbness in his fingers.

¶ 24    On March 22, 2007, Dr. Mark Levin performed an independent medical examination of the claimant at the employer's request. Dr. Levin wrote in his report that the claimant's injury of August 9, 2005, appeared to be a cervical myofascial strain. He wrote that he could not "relate his shoulder pathology and/or any additional treatment or surgical treatment that he had to the left shoulder to his alleged injury of August of 2005." He opined that the claimant's "left shoulder pathology is not consistent with the mechanisms of injury he describes from a work injury of August 9, 2005."

¶ 25    On April 20, 2007, Dr. Zoellick examined the claimant and opined that he was at maximum medical improvement regarding his left shoulder. Dr. Zoellick noted that the claimant continued to have neck pain radiating to both shoulders, as well as impingement syndrome of the right shoulder, and bilateral carpal tunnel syndrome.

¶ 26    In May of 2007 the claimant had an MRI scan of his cervical spine. On June 4, 2007, Dr. Zoellick interpreted the findings of the MRI scan. He found that the scan revealed a far lateral disk protusion at C6-C7, right lateral recess and right foraminal narrowing, and spondylosis at C5-C6. He prescribed a Medrol Dosepak.

¶ 27    Dr. Zoellick examined the claimant on July 13, 2007, and diagnosed him with a cervical disk herniation, bilateral shoulder tendonitis, and possible right carpal tunnel syndrome.

¶ 28    On November 6, 2007, Dr. Matthew Ross performed an independent medical examination on the claimant at the request of his attorney. In a letter to the claimant's attorney, Dr. Ross wrote that the claimant has suffered from persistent neck pain since his August 9, 2005, work

injury. He noted that the claimant had preexisting cervical spine degenerative changes, especially at the C6-C7 level. Dr. Ross opined that the work injury most likely aggravated the preexisting condition and caused it to become symptomatic. He recommended that the claimant undergo a cervical discogram pain study at the C4-C5, C5-C6, and C6-C7 levels.

¶ 29    The claimant underwent a discogram on August 4, 2008, which revealed problems at C5-C6 and C6-C7. Dr. Ross recommended that the claimant undergo an anterior cervical diskectomy and fusion at the C5-C6 level as a means of trying to bring his neck pain under better control.

¶ 30    On January 21, 2009, Dr. Ross performed a C5-C6 anterior cervical diskectomy and fusion. On June 25, 2009, Dr. Ross prescribed a work hardening program. On July 3, 2009, the claimant noticed swelling in the right knee while in therapy. On July 24, 2009, it was noted that the claimant had right knee pain and swelling that limited his progress in the exercise routine. On August 29, 2009, the claimant was discharged from the work-hardening program by his physician because he had not participated since July due to knee pain.

¶ 31    On July 28, 2009, Dr. Ross examined the claimant and referred him to Dr. James Fox. Dr. Fox treated the claimant for a tear of the posterior horn of the medial meniscus and eventually performed an arthroscopy, partial medial meniscectomy, excision medial plica, and debridement of the right knee on the claimant.

¶ 32    The claimant was terminated from his work with the employer on October 17, 2009, because he was unable to perform the essential functions of his assigned job and there were no reasonable accommodations available to allow him to continue work with the employer.

¶ 33    The claimant testified that once he stopped treatment for his right knee, he resumed treatment for his cervical spine. On December 22, 2009, Dr. Ross examined the claimant and directed him to continue work hardening. On March 4, 2010, Dr. Ross noted that the work-hardening program had enabled the claimant to work in the light-medium physical demand level, but that his job with the employer required him to work at the heavy level. The claimant was directed to continue work conditioning and was noted to be capable of working at the light-medium physical demand level lifting up to 30 pounds.

¶ 34    On April 5, 2010, the claimant underwent a vocational assessment with Vocamotive. He had previously undergone a vocational evaluation on October 13, 2009, by the employer's vocational expert, Brown Rehab Management. Both Vocamotive and Brown Rehab Management noted that the claimant did not have his graduate equivalency degree (GED) and recommended that he obtain it. The claimant took the GED test on March 5, 2011, and passed. The claimant worked with Vocamotive to find gainful employment. Vocamotive noted that the claimant was no longer able to engage in his customary and usual line of employment. The claimant ultimately secured employment at ATI Physical Therapy as a driver. He began on June 13, 2011, and earned $9.20 per hour. Beginning September 15, 2011, the claimant was given a raise to $10 per hour.

¶ 35    Based on a collective bargaining agreement between the claimant's union and the employer, the claimant would be earning $75,588 per year in his regular employment or $1,434.38 per week. The claimant provided documentation that was admitted into evidence that showed that for the pay period September 30, 2011, through November 30, 2011, the claimant earned $3,922.85 or an average of $392.28 per week.

¶ 36     The claimant testified that at the present time his left shoulder still hurts and his right shoulder makes a popping sound when he lifts it. He stated that he does not have the full range of motion in his left shoulder that he did before the surgery. He stated that he has to sleep on his right side because if he sleeps on his left side, his hand falls asleep. The claimant testified that his neck still hurts at times.

¶ 37     The arbitrator found that the claimant's conditions of ill-being in his left and right shoulders were causally related to his February 28, 2005, accident. The arbitrator noted that there was no medical evidence in the record to support a finding that the January 12, 2006, accident amounted to an intervening or superseding injury. The arbitrator found that the claimant's condition of ill-being relating to his cervical and lumbar spine was causally related to his August 9, 2005, injury. He found that the claimant failed to prove that the January 12, 2006, accident resulted in any current condition of ill-being. The arbitrator found that the claimant's February 28, 2005, accident resulted in a 25% disability to the claimant's left arm and a 15% disability to his right arm. The arbitrator found that based on the medical records and the opinions of Vocamotive and Brown Rehab Management, the claimant's August 9, 2005, work injury resulted in him being incapacitated from pursuing his usual and customary line of employment as contemplated in section 8(d)(1) of the Act. The arbitrator awarded the claimant a wage differential of $694.73 per week under section 8(d)(1) of the Act.

¶ 38     The employer sought review of this decision before the Commission. The Commission modified the partial disability benefits awarded to the claimant for his left and right shoulders. It found that *Will County Forest Preserve District v. Illinois Workers' Compensation Comm'n*, 2012 IL App (3d) 110077WC, held that when a claimant sustains a work-related injury to the shoulder, benefits are proper under section 8(d)(2). In accordance with *Will County Forest Preserve District*, the Commission converted the claimant's permanent disability award of 25% loss of use of the left arm and 15% loss of use of the right arm to a person-as-a-whole award under section 8(d)(2). The Commission determined that his loss was 18.8% of the person-as-a-whole. The employer was ordered to pay the claimant $567.87 per week for a period of 94 weeks as provided in section 8(d)(2) of the Act because the injuries he sustained caused permanent partial disability equivalent to 18.8% loss of the use of the person-as-a-whole. The Commission otherwise affirmed and adopted the decision of the arbitrator.

¶ 39     The employer sought judicial review of the Commission's decision in the circuit court of Lake County. The circuit court confirmed the Commission's decision. The employer appealed.

¶ 40                                          ANALYSIS

¶ 41     The employer argues that the Commission erred in granting the claimant awards under both a wage differential theory under section 8(d)(1) of the Act and also on a percentage of a person-as-a-whole under section 8(d)(2) of the Act.

¶ 42     The employer argues that under the plain language of section 8(d), when a claimant seeking permanent partial disability benefits has sustained two separate and distinct injuries to the same body part, if there is one condition of ill-being, the Act allows compensation as either a percentage of a person-as-a-whole or as a wage differential, but not both.

¶ 43     The employer contends that on February 28, 2005, the claimant injured his left shoulder and was awarded 18.8% disability to the man-as-a-whole under section 8(d)(2), and then on

August 9, 2005, he injured his neck and reinjured his left shoulder and was awarded a wage differential award under section 8(d)(1). The employer argues that the claimant cannot have both a loss of earning capacity under section 8(d)(2) and a wage differential under section 8(d)(1) because that results in a dual award for the same injury. The employer argues that the claimant sustained two separate and distinct injuries to the same body part and received a dual award under section 8(d).

¶ 44    The claimant filed separate claims for separate injuries. The cases were consolidated for convenience and not for the purpose of substance. The claimant requested, and the employer agreed to, a separate decision as to the nature and extent of each claim. The determination of the extent or permanency of a claimant's disability is a question of fact for the Commission, and its decision will not be reversed on appeal unless it is against the manifest weight of the evidence. *Ingalls Memorial Hospital v. Industrial Comm'n*, 241 Ill. App. 3d 710, 718, 609 N.E.2d 775, 782 (1993). Because the determination of whether the claimant is entitled to an award of benefits under section 8(d)(1) or 8(d)(2) requires resolution of factual matters, the manifest weight of the evidence standard is the proper standard of review. A finding of fact is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent. *Swartz v. Industrial Comm'n*, 359 Ill. App. 3d 1083, 1086, 837 N.E.2d 937, 940 (2005). "[A] reviewing court must not disregard or reject permissible inferences drawn by the Commission merely because other inferences might be drawn, nor should a court substitute its judgment for that of the Commission unless the Commission's findings are against the manifest weight of the evidence." *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 206, 797 N.E.2d 665, 673 (2003).

¶ 45    The employer argues that *Baumgardner v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 274, 947 N.E.2d 856 (2011), is applicable. It contends that, pursuant to *Baumgardner*, because the claimant suffered multiple injuries to the same body part as a result of successive accidents and those claims were tried together, the Commission should have evaluated the totality of the evidence as it related to the claimant's overall condition of ill-being at the time of the hearing and should have made a single award encompassing the full extent of the disability resulting from the claimant's February 28, 2005, accident and his August 9, 2005, accident.

¶ 46    In *Baumgardner* the parties stipulated that the claimant sustained injuries to his right knee in April 1996 and May 1998, and that the condition of ill-being in his right leg was causally related to the injuries sustained on those two dates. *Id.* at 277, 947 N.E.2d at 859. The claims were consolidated and the arbitrator issued a single decision awarding the claimant a wage differential for the duration of his disability pursuant to section 8(d)(1) of the Act. *Id.* The Commission affirmed the arbitrator's decision with a modification to correct a clerical error. *Id.* at 277-78, 947 N.E.2d at 859. The claimant appealed, arguing that the Commission erred in finding that he was not entitled to a scheduled permanent partial disability (PPD) award under section 8(e)(12) of the Act for the injury he sustained in April 1996. *Id.* at 278, 947 N.E.2d at 860.

¶ 47    The appellate court affirmed the Commission's decision finding that its denial of a scheduled PPD award under section 8(e) of the Act for the April 1996 injury was not against the manifest weight of the evidence. *Id.* at 280-81, 947 N.E.2d at 861. The court held that "where a claimant has sustained *two separate and distinct injuries to the same body part* and the claims are consolidated for hearing and decision, it is proper for the Commission to

consider all of the evidence presented to determine the nature and extent of his permanent disability as of the date of the hearing." (Emphasis added.) *Id*. at 279-80, 947 N.E.2d at 861.

¶ 48    The employer argues that this case is similar to *City of Chicago v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 258, 947 N.E.2d 863 (2011). In *City of Chicago*, the claimant sought workers' compensation benefits from his employer for an injury to his lower back arising out of and in the course of his employment on August 27, 2002. *City of Chicago*, 409 Ill. App. 3d at 259, 947 N.E.2d at 864. While that claim was pending, the claimant returned to work and reinjured his lower back on May 5, 2004. *Id*. The two claims were heard in a consolidated arbitration hearing. The arbitrator awarded the claimant PPD benefits for the August 27, 2002, injury claim equal to 20% loss of the person-as-a-whole pursuant to section 8(d)(2) of the Act, and a wage differential determination pursuant to section 8(d)(1) of the Act for the May 5, 2004, injury claim. The Commission affirmed and adopted the arbitrator's award, and the employer appealed. *Id*. at 259-60, 947 N.E.2d at 865. The employer argued that the Act prohibited two permanency awards for the same current condition of ill-being even if that current condition of ill-being was the result of two separate industrial accidents. *Id*. at 262, 947 N.E.2d at 866.

¶ 49    The appellate court affirmed the wage differential award and vacated the 20% loss of the person-as-a-whole award. *Id*. at 266, 947 N.E.2d at 870. The court held that the claimant was not entitled to an award under both section 8(d)(1) and 8(d)(2) for the same condition of ill-being. *Id*. at 265, 947 N.E.2d at 869. The court found that the first injury had not resolved itself and was clearly a factor when the claimant suffered the second injury. *Id*. at 264, 947 N.E.2d at 868. The court further found that it was impossible to separate and distinguish which aspects of the claimant's current condition of ill-being were attributable to which of the two accidents. *Id*. The court held that "[w]here a claimant has sustained *two separate and distinct injuries to the same body part* and the claims are consolidated for hearing and decision, unless there is some evidence presented at the consolidated hearing that would permit the Commission to delineate and apportion the nature and extent of the permanency attributable to each accident, it is proper for the Commission to consider all the evidence presented to determine the nature and extent of the claimant's permanent disability as of the date of the hearing." (Emphasis added.) *Id*. at 265, 947 N.E.2d at 869.

¶ 50    The holdings in *Baumgardner* and *City of Chicago* apply where the claimant has sustained two separate and distinct injuries to the same body part. The employer argues that under section 8(d), as interpreted by *Will County Forest Preserve District*, the claimant's injury to his shoulders, neck, and back are all injuries to the same body part because they are all injuries to the person-as-a-whole. Contrary to what the employer asserts, the court in *Will County Forest Preserve District* did not hold that all injuries to the person-as-a-whole are injuries to the same body part. In *Will County Forest Preserve District* the court found that the arm and shoulder are distinct parts of the body. *Will County Forest Preserve District*, 2012 IL App (3d) 110077WC, ¶ 19, 970 N.E.2d 16. The court held that because the claimant's shoulder injury did not qualify as a scheduled loss to the arm, section 8(d)(2), which provides for a person-as-a-whole-award, was applicable. *Id*. ¶ 21, 970 N.E.2d 16.

¶ 51    The employer in the instant case concludes that because injuries to a shoulder and to a neck are both compensated as person-as-a-whole, they are injuries to the same body part. Section 8(d)(2) provides for a person-as-a-whole award where the claimant sustains serious and permanent injuries not covered by section 8(c) or 8(e) of the Act. *Id*. While section 8(d)(2)

covers injuries that are not specifically listed in sections 8(c) and 8(e) as person-as-a-whole injuries, it never classifies them as injuries to the same body part. Section 8(d)(2) identifies the minimum amount of compensation for injuries to certain parts of a person-as-a-whole including vertebra, fracture of the skull, fracture of facial bones, and injuries resulting in the loss of a kidney, spleen, or lung. 820 ILCS 305/8(d)(2) (West 2004). The primary rule of statutory construction requires that effect must be given to the intent of the legislature. *Wal-Mart Stores, Inc. v. Industrial Comm'n*, 324 Ill. App. 3d 961, 967, 755 N.E.2d 98, 103 (2001). "In order to ascertain the legislature's intent, courts must begin by examining the language of the statute, reading the statute as a whole, and construing it so that no word or phrase is rendered meaningless or superfluous." *Id*. The legislature would not list the minimum compensation for injuries to specific person-as-a-whole body parts if all person-as-a-whole injuries were to be treated as injuries to the same body part. Thus, injuries to different body parts of the person-as-a-whole are not injuries to the same body part.

¶ 52    Central to the holdings in both *Baumgardner* and *City of Chicago* was that the claimants suffered multiple injuries to the same body part. In the instant case, the claimant sustained injuries to his left shoulder and right shoulder in the first accident and to his neck and lumbar spine in the second accident. While the claimant's injuries to his shoulder, neck, and back are all injuries to the person-as-a-whole, they are not injuries to the same body part. They are injuries to distinct body parts. Because the claimant did not sustain multiple injuries to the same body part as a result of successive accidents, *Baumgardner* and *City of Chicago* do not apply.

¶ 53    In the instant case, the claimant suffered injuries in two accidents involving separate parts of his body. The first accident resulted in injuries to his left shoulder and right shoulder. In the second accident he injured his neck and lumbar spine. The February 28, 2005, accident which resulted in injury to the claimant's left shoulder necessitated a left shoulder rotator cuff repair with an arthroscopic debridement of the labral tear and open acriomioplasty. The condition caused the claimant to compensate with his right shoulder, leading to problems with that shoulder. This resulted in permanent partial impairment. The claimant was able to return to his job after the first accident. The Commission awarded the claimant PPD of 18.8% of the person-as-a-whole under section 8(d)(2) of the Act for the disability suffered in the first accident, which caused him to suffer physical impairment but no impairment of earning capacity.

¶ 54    The August 9, 2005, accident caused injury to the claimant's neck and lumbar spine. Dr. Ross examined the claimant and noted that he had preexisting cervical spine degenerative changes. He opined that the August 9, 2005, work accident aggravated the preexisting condition and caused it to become symptomatic. Dr. Ross recommended a discogram, and based on the results of the discogram he recommended surgery. Dr. Ross performed a C5-C6 anterior cervical diskectomy and fusion on the claimant. The claimant's condition of ill-being changed after the second accident. After the second accident, the claimant was precluded from returning to his regular course of employment. The claimant was given a wage differential under section 8(d)(1) of the Act for the second accident because his disability resulting from the injury caused an impairment of earning capacity.

¶ 55    Based upon the record before us, the Commission's decision to make separate awards for injuries to different body parts in separate accidents is not contrary to the manifest weight of the evidence.

¶ 56                                            CONCLUSION

¶ 57          For the foregoing reasons, the judgment of the circuit court of Lake County, confirming the decision of the Commission, is affirmed.

¶ 58          Affirmed.