(No. 56879.—

ILLINOIS FORGE, INC., Appellee, v. THE INDUS-
TRIAL COMMISSION *et al.* (Arlyn Sayers, Appellant).

*Opinion filed March 25, 1983.*

Raymond Whitney, David L. Gore, and Kenneth B. Wolfe, Jr., of Kleiman & Whitney, of Chicago, for appellant.

Ward, Ward, Murray, Pace & Johnson, of Sterling (David E. Murray and Joseph E. Heaton, Jr., of counsel), for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

On September 1, 1976, petitioner, Arlyn Sayers, filed two applications for adjustment of claim with the Industrial Commission. One was brought under the Workmen's Compensation Act (Ill. Rev. Stat. 1975, ch. 48, par. 138 et seq.) and the other was brought under the Workmen's Occupational Diseases Act (Ill. Rev. Stat. 1975, ch. 48, par. 172.36 et seq.). Both applications sought compensation for petitioner's loss of hearing and alleged that the hearing loss arose out of and in the course of his employment with respondent, Illinois Forge, Inc., on June 17, 1976. The application for adjustment of claim filed under the Workmen's Compensation Act and the decisions of the arbitrator and the Industrial Commission in that case are not contained in the record, but the parties are in agreement as to what occurred. An arbitrator for the Industrial Commission found that petitioner suffered a compensable hearing loss of 31% in his right ear and 26% in his left ear and awarded compensation accordingly under the Workmen's Compensation Act. The arbitrator dismissed the application for recovery under the Workmen's Occupational Diseases Act. On review, the Industrial Commission set aside the decision of the arbitrator in the occupational diseases case and found

that petitioner suffered a compensable hearing loss of 15.16% in his right ear and 24.25% in his left ear and awarded compensation accordingly. The circuit court of Whiteside County set aside the decision of the Commission, and petitioner appealed (87 Ill. 2d R. 302(a)).

Petitioner testified that he worked for respondent from October 1, 1955, to June 17, 1976, as a "hammer man," which entailed putting steel between two dies so that a 2,500-pound hammer could drop down on the steel and forge it. When asked what happens when the hammer strikes the steel, petitioner replied, "It makes a lot of noise." Petitioner estimated that the hammer dropped between 15 and 30 times per minute, and that there were 13 other hammers in the shop which operated in the same manner. Petitioner testified that from the first day on the job he noticed a ringing in his ears and that he still has ringing in his ears which makes it difficult for him to understand people when they speak to him, especially over the telephone. Petitioner testified that he left respondent's employ on June 18, 1976, to work as a salesman for a feed company for about six months and then became a district sales representative for Lutheran Brothers Life Insurance Company.

Charles Russell, called by respondent, testified that he was a consultant for the Philadelphia firm of Hearing Conservation Noise Control. He testified that the principal officer of the corporation is an otolaryngologist who has been engaged in the field of hearing loss and hearing conservation for 30 years. He stated that respondent had engaged his firm to establish and monitor an effective hearing-conservation program which would include the training of audiometric technicians, making recommendations regarding the acquisition of appropriate hearing-testing equipment, calibrating and certifying the accuracy of that equipment and the test procedures, and reviewing and evaluating the hearing records on the em-

ployees by doctors and audiology staff. Russell testified that he had been with the firm for four years and was currently the director of field activities and that his duties included the training of audiometric technicians for his company's clients so that their employees' hearing could be monitored. He stated that respondent had a Bell Tone Model 9D air-conduction audiometer and a 400 A audiometric testing booth, which were installed in 1974. Russell testified that he checked the calibration and the functional operation of this equipment at least annually, and usually more often, and that he also tested the ambient noise level in the testing booth. He testified that he trained two employees for respondent to test the hearing of the hammer men at respondent's plant, and explained that the training consisted of a standard 20-hour course which was administered at respondent's plant. He stated that he was trained by audiologists, apparently one of whom was the director of training for the program which he attended.

Dr. M. Reese Guttman testified as a joint witness. Dr. Guttman received his medical degree from the University of Illinois School of Medicine in 1924. While it is unnecessary to detail Dr. Guttman's qualifications, he testified that he did a combined residency and preceptorship in otolaryngology under a former president of the American Board of Otolaryngology, did post-graduate work at several European universities, taught otolaryngology at the University of Illinois and later at Loyola University, had published a number of articles dealing with hearing impairment, had lectured on many occasions to various groups, including the Illinois Association of Compensation Attorneys, and had been practicing for 52 years. Dr. Guttman testified that he examined petitioner, and he described in detail the various tests he performed on petitioner to determine the extent of his hearing loss, one of which was an audiometric examination. Dr. Guttman

testified that a certificate of standardization and calibration had been issued for his audiometer on May 12, 1977, and that a certificate certifying his sound room as meeting OSHA's standards had been issued that same day. When asked whether removal from a noise environment could have an effect upon a hearing loss, Dr. Guttman explained that hearing could improve but that the extent of improvement depended on the length of the exposure to the intolerable noise environment. Specifically, Dr. Guttman stated:

"*** the degree [of improvement] would depend upon how long the exposure had been in years or decades and, in other words an individual who's only been exposed for a comparative short period of time, measured in months and years after you remove them from the environment, he might have a substantial recovery in his hearing ability, but an individual who would be employed in a period of time measured in years and decades, removal for a period of at least six months might result in comparatively minor improvement."

Based on his June 28, 1977, examination of petitioner, Dr. Guttman found that petitioner had a hearing loss of 31% in the right ear and 26% in the left ear. An examination performed at respondent's plant by technicians trained by Russell indicate that on May 6, 1975, petitioner had a hearing loss of 51.56% in the right ear and 54.60% in the left ear. Results of the May 3, 1976, test performed by respondent's employees reveals that petitioner had a 66.72% loss in his right ear and a 78.86% loss in his left ear. Dr. Guttman, when asked about the differences in the results of these tests, emphasized that his equipment had been properly certified.

Petitioner contends that the decision of the Industrial Commission was not contrary to the manifest weight of the evidence and in setting it aside the circuit court erred. Petitioner suggests that the circuit court may have erroneously concluded that the Commission's decision was incor-

rect because when Dr. Guttman's findings are compared with respondent's employees' findings, it appears that petitioner's hearing had improved since 1975. Petitioner contends that from the undisputed evidence the Industrial Commission could have drawn the inference that the discrepancy in findings between the tests performed by Dr. Guttman and the tests performed by respondent's employees arose from the fact that Dr. Guttman used better equipment and was more qualified to perform the audiograms than were respondent's employees. Petitioner contends that the Industrial Commission could have drawn the inference that respondent's employees' tests were accurate in showing the change in condition of petitioner's hearing loss, but were inaccurate to the extent that they purported to reflect the extent of the hearing loss based on the accepted standard medical formula used by practicing ear, nose and throat specialists. Petitioner argues that the Industrial Commission's decision to determine the extent of his hearing loss from respondent's records was not against the manifest weight of the evidence.

Respondent argues that "in a case such as this where there appears to be no disputed facts, the issue on appeal involves a question of law, and in such a case a court is not bound by a decision of the Industrial Commission." Respondent also argues that the record shows that the employees of respondent who tested petitioner were "certified" and the machines used were properly calibrated, and thus there is no reason to believe that the results of these tests were not accurate.

We agree with petitioner that this case involves the resolution of conflicting inferences which can be drawn from undisputed evidence. We also agree that the Commission's resolution of these conflicting inferences was not against the manifest weight of the evidence. The Commission could have drawn the inference from the respective qualifications of Dr. Guttman and respondent's employees and the differ-

ent equipment utilized in the testing procedure that Dr. Guttman's tests more accurately reflected the extent of petitioner's hearing loss. The Commission could have also drawn the inference that while the audiometric tests conducted by respondent's employees were not accurate estimates of petitioner's hearing loss, they did accurately reflect the change in the extent of petitioner's hearing loss. In light of Dr. Guttman's explanation that removal from long-term exposure measured in terms of years and decades would only result in "comparatively minor improvement" in a person's hearing loss, the Commission was entitled to draw the inference that petitioner's hearing had not improved from the level existing on July 1, 1975. As petitioner noted, the Commission might have believed that petitioner's ability to work as a salesman and later as a district sales representative after he left respondent's employ suggests that petitioner's hearing loss could not have been as extensive as the results of the tests conducted by respondent's employees indicate. The drawing of factual inferences concerning the nature and extent of disabilities based on medical testimony is peculiarly in the province of the Industrial Commission's expertise, and nothing in this record suggests that its decision should be disturbed.

Respondent argues that the Industrial Commission erred in awarding the claimant disability based on 100 weeks of disability for each ear rather than on 50 weeks' disability per ear. Respondent points out that the accident occurred before section 7 was revised to provide 100 weeks' compensation for the loss of one ear. (1976 Ill. Laws 1681.) Respondent argues that the award of 39.42 weeks of compensation should be reduced to 18.41 weeks of compensation. Petitioner concedes that this argument is correct, but argues that the issue was waived since it was raised for the first time on appeal.

An issue raised for the first time on appeal is ordinarily waived, but the question here is the proper calculation to

be made based on the then-controlling statute. Clearly waiver should not apply here.

For the reasons stated, the judgment of the circuit court of Whiteside County is reversed, and the cause is remanded to the Industrial Commission with directions to enter an award based on section 7 of the Workmen's Occupational Diseases Act as it read on June 17, 1976 (Ill. Rev. Stat. 1975, ch. 48, par. 172.42).

*Reversed and remanded,*
*with directions.*