# Illinois Official Reports

## Appellate Court

---

**Pisano v. Illinois Workers' Compensation Comm'n, 2018 IL App (1st) 172712WC**

---

| | |
|---|---|
| Appellate Court Caption | WILLIAM PISANO, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (The City of Chicago, Appellee). |
| District & No. | First District, Workers' Compensation Commission Division Docket No. 1-17-2712WC |
| Filed | December 7, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-50753; the Hon. Daniel J. Kubasiak, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, vacated in part, and Commission's original decision reinstated in part. |
| Counsel on Appeal | Kevin Thomas Veugeler, of Healy Scanlon Law Firm, Ltd., of Chicago, for appellant. |
| | Joseph Andrew Zwick, of Hennessy & Roach, P.C., of Chicago, for appellee. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion. Presiding Justice Holdridge and Justices Hoffman, Cavanagh, and Barberis concurred in the judgment and opinion. |

**OPINION**

¶ 1      Claimant, William Pisano, filed three applications for adjustment of claim seeking benefits under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2006)) for injuries he sustained while working for respondent, the City of Chicago. The claims were consolidated, and the matter proceeded to an arbitration hearing pursuant to section 19(b) of the Act (820 ILCS 305/19(b) (West 2006)). The arbitrator issued a single decision on all three claims. Relevant to this appeal, the arbitrator awarded (1) permanent partial disability (PPD) benefits pursuant to section 8(e) of the Act (820 ILCS 305/8(e)(9), (e)(10) (West 2006)) for injuries to claimant's right wrist and right elbow arising out of the first accident and (2) a wage-differential award pursuant to section 8(d)(1) of the Act (820 ILCS 305/8(d)(1) (West 2006)) for an injury to claimant's right wrist arising out of the second accident. The arbitrator determined that the injuries from the third accident arose out of and in the course of the vocational-rehabilitation process for the second accident. As such, the arbitrator concluded that any permanency benefits were accounted for in relation to the award for the second accident. In addition, the arbitrator denied claimant's request for penalties and attorney fees pursuant to sections 16, 19(k), and 19(*l*) of the Act (820 ILCS 305/16, 19(k), 19(*l*) (West 2006)). The Illinois Workers' Compensation Commission (Commission) modified the rate and commencement date of the wage differential awarded for the second accident but otherwise affirmed and adopted the arbitrator's decision.

¶ 2      On judicial review, the circuit court of Cook County confirmed the Commission's decision in part and set it aside in part. In particular, the court disagreed with the Commission to the extent it awarded claimant both a scheduled PPD award pursuant to section 8(e) of the Act and a wage differential pursuant to section 8(d)(1) of the Act. Relying on *Baumgardner v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 274 (2011), and *City of Chicago v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 258 (2011), the court held that claimant should be awarded one type of benefit or the other, but not both. As such, the court remanded the matter to the Commission with instructions to "evaluate the totality of the evidence and provide a single award encompassing the full extent of the disability resulting from all accidents involved in this consolidated case." The court otherwise confirmed the Commission's decision.

¶ 3      On remand, the Commission determined that the full extent of claimant's disability resulting from all of his accidents warranted a finding of a wage-differential award pursuant to section 8(d)(1) of the Act. In so finding, the Commission modified its original decision by vacating the section 8(e) awards. On judicial review, the circuit court confirmed the decision of the Commission upon remand. Claimant now appeals, raising issues concerning the permanency awards entered by the Commission and the Commission's decision to deny his request for penalties and fees pursuant to sections 16, 19(k), and 19(*l*) of the Act. For the reasons that follow, we affirm in part, reverse in part, vacate in part, and reinstate in part the Commission's original decision.

¶ 4                          I. BACKGROUND

¶ 5      Claimant filed three applications for adjustment of claim seeking benefits under the Act for injuries he sustained while working for respondent. In the first application, case No. 05-WC-49540, claimant alleged that on October 31, 2005, he injured his right elbow when he

slipped on grease while standing on the platform of a machine. In the second application, case No. 08-WC-47656, claimant alleged that on December 12, 2007, he aggravated his right wrist when he was struck by the side mirror of a car while directing traffic around a work area. In his third application, case No. 11-WC-16653, claimant alleged that on December 6, 2010, he sustained injuries to both shoulders, his right arm, and the person as a whole after he slipped on ice while going to a vocational-rehabilitation appointment.

¶ 6   The claims were consolidated, and the matter proceeded to an arbitration hearing pursuant to section 19(b) of the Act (820 ILCS 305/19(b) (West 2006)) over several dates between January 22, 2013, and September 3, 2013. In all three cases, the parties stipulated to the accidents. Additionally, in case Nos. 05-WC-49540 and 08-WC-47656, the parties stipulated to causation. The issues in dispute involved the nature and extent of the injuries, medical expenses, maintenance, and causation in case No. 11-WC-16653. In addition, prior to the arbitration hearing, claimant filed petitions for penalties and attorney fees alleging that respondent had refused to pay certain medical expenses and maintenance benefits. The following factual recitation is taken from the evidence presented at the arbitration hearing.

¶ 7   Claimant testified that the highest level of education he completed was his first year of high school. During his sophomore year, claimant left high school and briefly attended trade school. He then joined the Navy but was given a general discharge after six months due to color blindness. Claimant began working for respondent in 1979 as a roller engineer and eventually became a hoist engineer in respondent's water department. Claimant testified that his duties as a hoist engineer included operating, maintaining, and repairing various types of heavy equipment, including graders, backhoes, cranes, end loaders, forklifts, Bobcats, and snowblowers. Claimant testified the lifting requirement for a hoist engineer is up to 100 pounds. Claimant is right handed.

¶ 8                    A. October 31, 2005, Accident and Medical Treatment
¶ 9   Claimant testified that while working for respondent on October 31, 2005, he was directed to a jobsite with his backhoe. While climbing onto the machine, claimant slipped on grease, fell backwards, and landed on his right arm and right side. Claimant immediately felt pain and noticed his right arm swell.

¶ 10   Following the accident, claimant sought treatment at MercyWorks, where he was diagnosed with a right elbow fracture, right wrist contusion, and right shoulder strain. Claimant was taken off work, prescribed medication, given a sling for his arm, and referred to Dr. William Heller of Midland Orthopedics. Dr. Heller recommended that claimant refrain from using his right arm, prescribed a course of physical therapy, and instructed claimant to follow up in six weeks.

¶ 11   Claimant returned to MercyWorks on November 8, 2005, with complaints of right hip pain and increased right wrist pain. A course of therapy was recommended. On December 27, 2005, claimant underwent magnetic resonance imaging (MRI) of the right wrist. The MRI revealed a triangular fibrocartilage complex (TFCC) tear. Dr. Heller opined the TFCC tear was due to claimant's job duties and likely became symptomatic due to the fall. Dr. Heller administered a cortisone injection to the wrist and recommended continued physical therapy. Claimant was also referred to Dr. Daniel Nagle. On March 1, 2006, Dr. Nagle performed surgery on claimant's right wrist, consisting of an arthroscopy with TFCC debridement. Following surgery, Dr. Nagle noted that claimant had extensive damage to his right wrist and had three

options—living with the wrist as is, undergoing a partial fusion of the wrist, or undergoing a panarthrodesis. The physician at MercyWorks instructed claimant to continue treating with Dr. Nagle and to remain off work. On March 22, 2006, claimant presented to MercyWorks and reported that his right shoulder, right elbow, and right hip were "fine."

¶ 12      On April 21, 2006, claimant underwent a functional capacity evaluation (FCE). The FCE was considered valid and placed claimant at the light-to-medium physical-demand level with lifting restrictions of 55 pounds from floor to waist on an occasional basis and 30 pounds from waist to overhead on an occasional basis. This did not meet the job demands of a hoist engineer, which requires a heavy physical-demand level with lifting of 100 pounds occasionally and 50 pounds frequently. On May 11, 2006, Dr. Nagle discharged claimant with permanent restrictions pursuant to the April 2006 FCE. Initially, respondent was unable to accommodate these restrictions, so claimant remained off work. However, respondent eventually found a position for claimant as a mail van driver.

¶ 13      On July 11, 2006, Dr. Nagle reevaluated claimant's right wrist and recommended claimant continue with the restrictions outlined in the FCE. Dr. Nagle next evaluated claimant on October 10, 2006. At that time, claimant complained of pain in his right wrist and elbow and occasional popping and clicking in his right elbow. Dr. Nagle indicated that absent additional surgical intervention, claimant had reached maximum medical improvement (MMI) with permanent light-duty restrictions. He instructed claimant to return on an as-needed basis.

¶ 14      Claimant returned to Dr. Nagle's office on March 22, 2007. Claimant told Dr. Nagle that he wanted to return to his position as a hoist engineer. Dr. Nagle felt claimant's situation had improved, and he recommended a repeat FCE, which was performed on April 4, 2007. The FCE indicated that claimant could lift 100 pounds from floor to waist and 50 pounds from waist to overhead, which met the physical-demand level required of a hoist engineer. On May 10, 2007, claimant presented to Dr. Nagel and reported that, since the FCE, he had developed wrist pain. At that time, Dr. Nagel voiced disagreement with the finding of the April 2007 FCE and recommended that claimant refrain from activities that require him to heavily and repetitively axially load the wrist while it is in an extended position or lift more than 50 pounds from the waist to the shoulder.

¶ 15      On May 14, 2007, claimant returned to MercyWorks, where he was found to be at MMI, discharged, and instructed to return to limited-duty work with permanent restrictions. On July 26, 2007, Dr. Nagle received a job description for the hoist engineer position. Dr. Nagle noted that the job description made no mention of lifting 50 pounds above shoulder level. Accordingly, in a note dated July 27, 2007, Dr. Nagle authorized claimant to return to the regular duties of a hoist engineer as outlined in the job description he received. That same day, claimant was authorized to return to work full duty by MercyWorks. Claimant returned to work for respondent driving a graffiti blaster.

¶ 16          B. December 12, 2007, Accident and Medical Treatment

¶ 17      On December 12, 2007, claimant was working graffiti detail when his right hand was struck by the side mirror of a car as he was directing traffic. Claimant testified that he was evaluated at MercyWorks, where the physician told him "you're already injured, it's aggravated" and authorized claimant to return to work. On March 11, 2008, claimant went to MercyWorks with complaints of increased pain while performing routine job duties. At that time, claimant was diagnosed with a right wrist strain. He was placed on light duty with

- 4 -

instructions to use a wrist splint and not to lift more than 25 pounds. Respondent was unable to accommodate the restrictions. Claimant continued to complain of pain and was placed in therapy on April 22, 2008. On May 6, 2008, the physicians at MercyWorks discontinued claimant's therapy and referred him to Dr. Nagle.

¶ 18     On June 17, 2008, Dr. Nagle recommended use of a wrist splint along with anti-inflammatory medication and a return to work with no lifting more than 50 pounds above the shoulder. Claimant subsequently informed Dr. Nagle that the 50-pound restriction "was causing some difficulty with his return to work." Accordingly, on June 20, 2008, Dr. Nagel amended his return to work authorization to provide that claimant "is able to regular duty work [*sic*] as a hoist engineer." Meanwhile, an FCE performed on June 30, 2008, indicated claimant was capable of working at a medium physical-demand level, which was below the level needed to return to his job as a hoist engineer. Claimant underwent another round of physical therapy and work hardening. On September 15, 2008, the physicians at MercyWorks discharged claimant from their care at MMI with restrictions of no lifting more than 35 pounds occasionally and 20 pounds frequently. Respondent was unable to accommodate claimant's restrictions.

¶ 19     On September 25, 2008, claimant participated in a vocational-rehabilitation meeting with respondent's department of human resources. Claimant met with Edward Steffan of EPS Rehabilitation on July 29, 2009, to begin a job-search program. After that initial meeting with Steffan, claimant met with Duane Bigelow to discuss job-search strategies. Claimant continued to meet with Bigelow on a weekly basis throughout 2009 and 2010.

¶ 20                    C. December 6, 2010, Accident and Medical Treatment

¶ 21     On December 6, 2010, claimant was injured when he slipped on ice and fell to the ground as he was exiting his car to go to a vocational-rehabilitation session with Bigelow. Claimant was carrying his vocational worksheets at the time. Claimant testified that he immediately felt pain in his back, neck, and bilateral shoulders. Claimant sought care from Dr. Paul Prinz on December 16, 2010. Dr. Prinz prescribed an MRI of the neck and both shoulders. On December 24, 2010, Dr. Prinz noted the cervical MRI showed significant stenosis at multiple levels, the left shoulder MRI revealed a labral tear, and the right shoulder MRI was positive for a labral tear and a partial tear of the supraspinatus tendon. After his review of the MRI films, Dr. Prinz referred claimant to Dr. Michael Maday for further evaluation of the shoulders and to Dr. Francisco Espinosa for further evaluation of the neck and back.

¶ 22     Dr. Maday examined claimant on January 14, 2011, and diagnosed bilateral partial thickness tears of the supraspinatus tendons. Claimant declined Dr. Maday's recommendation for an injection on the basis it would provide only temporary relief. As a result, Dr. Maday prescribed a home exercise program and instructed claimant to return in one month. Claimant saw Dr. Espinosa on January 25, 2011. Dr. Espinosa ordered an MRI of the lumbar spine. He eventually diagnosed cervical degenerative disc disease and lumbar degenerative disc disease. Dr. Espinosa determined that no surgical intervention was required. Instead, he recommended a course of physical therapy and home exercises.

¶ 23     On January 31, 2011, Dr. Michael Kornblatt examined claimant at respondent's request. With respect to claimant's bilateral shoulders, Dr. Kornblatt diagnosed a work-related strain with preexisting acromioclavicular arthritis and rotator cuff tendonitis. Dr. Kornblatt concluded that the strain was causally related to the December 6, 2010, accident but the

preexisting arthritis and tendonitis were unrelated. In Dr. Kornblatt's view, claimant would reach MMI with respect to the bilateral shoulders after about four weeks of physical therapy and "possibly" one subacromial injection. With respect to claimant's cervical spine, Dr. Kornblatt diagnosed a work-related cervical strain and preexisting degenerative disc disease. Dr. Kornblatt related the cervical strain to the accident of December 6, 2010. Dr. Kornblatt opined that claimant would reach MMI with respect to the cervical spine after three to four weeks of physical therapy. With respect to claimant's lumbar spine, Dr. Kornblatt diagnosed mild lumbar strain. He opined that the lumbar condition was causally related to the work accident of December 6, 2010, and that claimant would reach MMI with respect to this condition after one session of physical therapy. Dr. Kornblatt further opined that claimant was capable of performing job-search activities, including searching for employment online, completing resumes, contacting potential employers via telephone, and meeting with vocational counselors. Dr. Kornblatt also concluded that claimant was capable of driving as long as he was not under the influence of medication. Finally, Dr. Kornblatt felt that claimant was capable of returning to work full time with a 25-pound lifting restriction and no over-the-shoulder work.

¶ 24     Claimant followed up with Dr. Maday on February 11, 2011. Dr. Maday prescribed a course of physical therapy. On February 21, 2011, claimant began physical therapy for his bilateral shoulders, neck, and lumbar spine. On May 27, 2011, claimant returned to Dr. Maday's office with complaints of right shoulder pain. Dr. Maday recommended continued therapy and home exercises and instructed claimant to refrain from heavy lifting and extensive driving. On July 1, 2011, claimant was discharged from physical therapy with a home exercise plan. On September 1, 2011, claimant presented to MercyWorks. At that time, he was diagnosed with a strain of the right wrist. He was discharged at MMI and authorized to return to work with a lifting restriction of 30 pounds.

¶ 25     Claimant testified that despite being placed on restricted light duty and complying with respondent's job-search requirements, his benefits were suspended on June 4, 2011. Benefits were reinstated after a section 19(b) appearance before an arbitrator on August 19, 2011. See 820 ILCS 305/19(b) (West 2006).

¶ 26                              D. Claimant's Current Condition

¶ 27     Claimant testified that he continues to experience pain in his wrist, elbow, and bilateral shoulders. Claimant wears a brace on his right wrist, especially while driving. He also has decreased range of motion in both shoulders and his wrist. Cold and damp weather cause problems as well. Claimant testified that he also continues to have stiffness and pain involving the neck, low back, and right hip.

¶ 28                                   E. Watchman Position

¶ 29     On August 15, 2011, claimant received a letter from Ashley Pak of respondent's department of water management informing him that he is "able to return to work within [his] restrictions to the position of Watchman, at $19.24." The letter further provided that the job offer "is contingent upon the successful completion of the Willing and Able Questionnaire, confirming your readiness to perform the duties of the position." Claimant was instructed to contact Pak "to begin the initial phase of the employment process."

¶ 30    Claimant testified that he contacted Pak, reported as instructed, and completed a questionnaire indicating he was willing and able to perform the duties of a watchman.[1] Claimant agreed that Pak contacted him on August 31, 2011, to ask if he was willing to do the job but denied that he was offered a job or instructed to get fingerprinted. Claimant told Pak that he wanted to discuss the watchman position with Dr. Maday and Dr. Nagle.

¶ 31    Claimant's request to see Dr. Nagle was denied, but claimant was authorized by respondent to see Dr. Maday. Claimant told Dr. Maday that he was offered a job as a watchman. Claimant presented Dr. Maday with a job description for a watchman that was posted by respondent online as part of a bid announcement. Claimant expressed concern that the position would require him to "confront somebody." Dr. Maday wrote: "[Claimant] returns today and apparently was offered a job as a watchman. Part of the job required possibility [*sic*] of contact with suspects and possibility [*sic*] of heavy lifting. He is continuing to complain of pain." Based on the job description, Dr. Maday felt that there may be portions of the watchman position that would violate claimant's light-duty restrictions.

¶ 32    Claimant testified that despite Dr. Maday's concerns, he pursued the watchman position. However, in a letter dated November 28, 2011, respondent's attorney indicated that the watchman position was no longer available. Claimant testified that respondent paid him maintenance until May 5, 2012, when he began receiving a wage-differential benefit of $684 per week.

¶ 33                        F. Testimony of Ashley Pak

¶ 34    Ashley Pak is an administrative services officer for respondent and is involved in the process of hiring watchmen for the water department. Pak testified that the hiring process begins when she receives a list of candidates. Pak contacts every candidate on the list and requests that he or she come to her office to complete a "willing and able questionnaire." The questionnaire details the responsibilities of the watchman position. To be hired, a candidate must express that he or she is willing and able to perform every aspect of the watchman position. Following completion of the questionnaire, the next step is for the candidate to be fingerprinted. If the candidate "pass[es] the fingerprint," job offers are extended to the candidates in the order their names appear on the list.

¶ 35    Pak identified a "willing and able questionnaire" signed by claimant and dated August 15, 2008. Pak had no record whether claimant was sent for fingerprinting in 2008. Pak testified that her next contact with claimant was in 2011, when she received a list of about 50 eligible candidates for the watchman position, including claimant, from respondent's committee on finance. At that time, there were between 11 and 15 watchman position openings. On August 15, 2011, Pak sent claimant a letter requesting he complete a "willing and able questionnaire" for a watchman position in the water department. On August 30 or 31, 2011, Pak telephoned claimant to inform him that he needed to be fingerprinted. Claimant told Pak that he would not come in for fingerprinting until he spoke with his lawyer and doctor. Pak never heard from claimant after that phone call. Pak testified that the watchman position "would have been [claimant's] if he had completed the whole process" and that she explained this to claimant.

_____

[1]The questionnaire admitted into evidence is dated August 15, 2008. Claimant testified that more likely than not this was an error and the correct date was August 15, 2011. As discussed later, however, Pak denied this was a possibility in her testimony.

¶ 36    On cross-examination, Pak acknowledged that, as an employee for respondent, claimant had previously been subject to fingerprinting and a background check. Pak testified that she was unable to find a letter from 2008 asking claimant to complete the "willing and able questionnaire" and that claimant did not complete a "willing and able questionnaire" in 2011. Pak testified that it is possible that claimant was verbally requested to complete the questionnaire in 2008. Pak did not believe that claimant presented to her office in 2011 and wrote the wrong date on the questionnaire. Pak agreed that at no time did she take any steps to determine if a watchman position was an appropriate job for claimant. She also testified that claimant was never issued a letter offering him a watchman position.

¶ 37                          G. Testimony of James Boyd

¶ 38    James Boyd, a certified vocational rehabilitation counselor and vocational evaluator, provided a vocational assessment of claimant. Boyd reviewed claimant's medical records, education, and work history. Boyd also performed a battery of vocational testing and conducted a transferable-skills analysis.

¶ 39    Boyd testified that while claimant had some good skills in terms of verbal reasoning, reading ability, reading comprehension, and vocabulary, there were several challenges to claimant returning to the work force. Given his long work history with one employer, claimant has few transferable skills and does not have a variety of training or work experiences that could match lighter types of jobs or physical restrictions. Moreover, an IQ test measuring nonverbal reasoning placed claimant in the lower fifth percentile. Testing also revealed lower scores in mechanical reasoning, visual problem solving, auditory comprehension, typing, and manual dexterity. Furthermore, testing showed that claimant is not interested in a wide range of jobs, although he expressed some interest in scientific types of jobs.

¶ 40    Boyd's primary recommendation for claimant was computer training. He testified that areas of employment that may be suitable for claimant included sales, customer service, parts clerk, and forklift operations. Boyd noted that claimant had conducted a job search involving at least 10 job contacts per week over several years. Nevertheless, claimant was provided very few interviews and no job offers. According to Boyd, the result of the job search indicated that absent retraining, a stable labor market does not exist for any of claimant's skills. Boyd opined that claimant has no transferable skills to alternate jobs within his physical capability. He further opined that claimant has a very limited and specific type of training that is not applicable to work he is currently or potentially qualified for and there is considerable wage loss. Boyd explained that even an entry-level job in the $12-per-hour range was not achievable absent additional computer training. Boyd testified that claimant has expressed a desire to go back to work and his three years of consistent job searching is an indication that he wants to work.

¶ 41    On cross-examination, Boyd acknowledged that, even if someone expresses little interest in a particular field, it does not mean that they would not be qualified and capable of working in that area. Boyd noted, for instance, that claimant only placed in the fifth percentile in the technology-skill area but most of his work history as a hoist engineer was in that area. It was Boyd's understanding that a watchman position was offered to claimant. Boyd testified that there is a "wide variance" of what a watchman position requires. Boyd was asked whether respondent's watchman position would be appropriate for claimant. Boyd testified that "[r]egardless of the lifting requirement or lack thereof, there were a couple of other things on

this job description that did not jive with the results of [his] vocational testing." This includes auditory comprehension, reasoning and problem solving, response to emergency situations, and dealing with multiple variables at the job.

## H. Testimony of Edward Steffan

Edward Steffan is a certified rehabilitation counselor hired by respondent to provide services to claimant. Steffan was assisted by Duane Bigelow, another certified rehabilitation counselor. Claimant received vocational rehabilitation services from Steffan and Bigelow between July 2009 and August 2011. Steffan did not perform any aptitude or vocational testing because claimant was not a candidate for any type of advanced training. Steffan oversaw claimant's compliance with a request by respondent's committee on finance that he fill out a job log and submit it weekly.

Steffan opined that claimant was both "employable and placeable." Steffan noted that claimant had a lifting restriction of 30 pounds occasionally, which would place him in the medium exertional level. Steffan opined that claimant could secure employment within his physical capacity in customer service, in a counter parts position, as a service writer at a mechanical repair organization, or as a forklift driver and earn between $10 and $20 per hour. Claimant believed that he could secure employment utilizing his heavy equipment operation skill to find work earning up to $41 per hour. Steffan agreed that claimant would benefit from computer training.

Steffan testified that the position of watchman is classified as sedentary, unskilled work in the Dictionary of Occupational Titles. The position typically involves monitoring security footage and calling 911 or other assistance if necessary but does not require physical confrontations. Steffan opined that, if there was a watchman position available that did not require physical confrontation, had a 30-pound lifting restriction, called for monitoring security footage and walking the premises, and required calling 911 if there was an unauthorized individual on the property, claimant would be qualified for the job.

On cross-examination, Steffan testified that, in the two-year period that vocational rehabilitation was authorized by respondent, he personally met with claimant only twice. Steffan confirmed that claimant was required to and did submit job-search logs to respondent every week. Claimant made 1100 job contacts but received no job offers. Respondent never provided Steffan with a job description for a watchman and never asked Steffan if a watchman position would be appropriate for claimant. Steffan acknowledged that a watchman is not always a sedentary job and that some watchmen function as security guards. Steffan was unaware if respondent offered claimant a job as a watchman. Steffan had not reviewed the job duties of a watchman with respondent, so he had no opinion whether a watchman position would be an appropriate job for claimant.

## I. Testimony of Daniel Misch

Daniel Misch is the foreman of construction laborers for respondent's department of water management and handles security for the department. Misch testified that the watchman position involves sitting at a department facility, answering phones, contacting the command center every hour, monitoring cameras, logging trucks in and out, and calling 911 and the command center if any unusual activity is observed. Misch testified that the watchman position does not involve lifting over 30 pounds or overhead lifting and that the only pushing and

pulling required would involve opening and closing a door. Misch added that the position does not require the physical apprehension of trespassers. Misch testified that, if a watchman observes an unauthorized individual on the premises, he or she is instructed to call 911 and the command center. Misch acknowledged that there are some watchman positions that require driving.

¶ 49　On cross-examination, Misch confirmed that claimant applied for a watchman position, but he was not involved in the hiring process and did not know if claimant was ever hired. Misch was not consulted to determine if claimant could work as a watchman. Further, he could not determine whether claimant was qualified to work the position, as he was not aware of claimant's restrictions.

¶ 50　　　　　　　　　　　　　　J. Arbitrator's Decision

¶ 51　On November 15, 2013, the arbitrator issued a single decision on all three claims. With respect to case No. 05-WC-49540, the arbitrator found that claimant sustained a fracture to the right elbow and an injury to the right wrist as a result of the October 31, 2005, accident. The arbitrator determined that the right elbow healed without complication. The right wrist injury consisted of a TFCC tear, which required surgery, but claimant was ultimately released to employment. The arbitrator awarded claimant 50.6 weeks of PPD benefits, representing a 20% loss of use of his right arm based on the right elbow fracture (820 ILCS 305/8(e)(10) (West 2006)) plus an additional 61.5 weeks of PPD benefits, representing a 30% loss of use of his right hand based on the injury to the right wrist (820 ILCS 305/8(e)(9) (West 2006)). Regarding medical expenses, the arbitrator noted that claimant submitted medical bills from Dr. Maday and ATI Physical Therapy. However, the underlying balances from these providers were paid through claimant's group insurance carrier, and the parties agreed at the arbitration hearing that respondent is entitled to a credit of $10,040.97 under section 8(j) of the Act (820 ILCS 305/8(j) (West 2006)). Accordingly, the arbitrator concluded that respondent had paid all appropriate charges for reasonable and necessary medical services and was not liable for any additional medical bills.

¶ 52　With respect to case No. 08-WC-47656, the arbitrator acknowledged that claimant was restricted from working as a hoist engineer. Nevertheless, the arbitrator concluded that claimant failed to prove by a preponderance of the evidence that he is permanently and totally disabled or that there is no stable labor market for his skills given his injuries. The arbitrator explained that respondent made a *bona fide* job offer to claimant for one of several watchman positions, which would have paid $19.24 per hour. However, claimant failed to complete the application process, so the jobs were offered to other candidates. Based on these findings, the arbitrator determined that claimant's injuries from the accident of December 12, 2007, caused a loss of earnings and awarded him a PPD benefit in the form of a wage differential pursuant to section 8(d)(1) of the Act (820 ILCS 305/8(d)(1) (West 2006)) in the amount of $616.45 per week from August 30, 2011, through the duration of the disability. The arbitrator also declined claimant's request for penalties and attorney fees pursuant to sections 16, 19(k), and 19(*l*) of the Act (820 ILCS 305/16, 19(k), 19(*l*) (West 2006)).

¶ 53　With respect to case No. 11-WC-16653, the arbitrator found that claimant's injuries from the fall on December 6, 2010, arose out of and in the course of the vocational-rehabilitation process in connection with the accident of December 12, 2007. As such, the arbitrator determined that any permanency benefits were accounted for under case No. 08-WC-47656.

¶ 54                              K. Commission's Decision

¶ 55        Both parties appealed. On May 29, 2015, the Commission issued a decision modifying in part and affirming and adopting in part the arbitrator's decision. The Commission affirmed and adopted the arbitrator's decision with respect to case Nos. 05-WC-49540 and 11-WC-16653. The Commission modified the arbitrator's decision with respect to case No. 08-WC-47656. In this regard, the Commission found that the arbitrator's award of a wage differential under section 8(d)(1) of the Act was appropriate, thereby affirming the arbitrator's finding that claimant failed to prove he was permanently and totally disabled and that there was no stable labor market for him. In doing so, the Commission found that the arbitrator's determination that claimant was offered a watchman position was supported by the record. However, the Commission concluded that the arbitrator incorrectly determined the rate and commencement date of the wage differential. Accordingly, the Commission modified the wage-differential rate to $668.27 per week with a commencement date of August 15, 2011.

¶ 56                              L. Circuit Court Decision

¶ 57        Both parties timely appealed the Commission's decision to the circuit court of Cook County. On February 16, 2016, the circuit court issued an opinion and order concluding that the Commission's findings as to case Nos. 05-WC-49540 and 11-WC-16653 were not against the manifest weight of the evidence. With respect to case No. 08-WC-47656, the court confirmed the Commission's decision in part and set it aside in part. The court confirmed the Commission's findings that claimant did not prove entitlement to an odd-lot permanent total disability award, that claimant was made a *bona fide* offer for the watchman position, and that he was not entitled to any penalties and fees. However, the court disagreed with the Commission's decision to award claimant both scheduled PPD awards pursuant to section 8(e) of the Act and a wage differential pursuant to section 8(d)(1) of the Act. Relying on *Baumgardner*, 409 Ill. App. 3d 274, and *City of Chicago*, 409 Ill. App. 3d 258, the court held that claimant should be awarded one type of benefit or the other, but not both. The court remanded the matter to the Commission with instructions to "evaluate the totality of the evidence and provide a single award encompassing the full extent of the disability resulting from all accidents involved in this consolidated case."

¶ 58                          M. Commission Decision on Remand

¶ 59        On October 28, 2016, in accordance with the circuit court's order, the Commission reconsidered and reevaluated the totality of the evidence and issued a decision on remand. The Commission determined that the full extent of claimant's disability resulting from all of his accidents warranted a finding of a wage-differential award pursuant to section 8(d)(1) of the Act, commencing August 15, 2011. In so finding, the Commission modified its May 29, 2015, decision by vacating the section 8(e) awards of 20% loss of use of the right arm and 30% loss of use of the right hand in case No. 05-WC-49540. The Commission also corrected a clerical error in the calculation of benefits.

¶ 60                      N. Circuit Court Decision Following Remand

¶ 61        Claimant sought judicial review of the Commission's remand decision in the circuit court of Cook County. The circuit court found that all issues were resolved by the court's previous February 16, 2016, order and, as such, were "law of the case" and could not be disturbed. It

therefore confirmed the decision of the Commission upon remand. This appeal by claimant ensued.

¶ 62                                    II. ANALYSIS

¶ 63        On appeal, claimant raises a number of issues. First, he argues that the Commission's original determination that he is entitled to both scheduled PPD benefits pursuant to section 8(e) of the Act and a wage-differential benefit pursuant to section 8(d)(1) of the Act was proper. Second, he argues that the Commission erred in not awarding him permanent and total disability (PTD) benefits. Third, claimant contends that the Commission erred in failing to award him a separate PPD award for the injuries he sustained in the 2010 fall. Finally, claimant argues that the Commission erred in failing to award penalties and attorney fees based on respondent's failure to pay certain medical expenses and maintenance benefits. We address each argument separately.

¶ 64                                    A. One Award

¶ 65        Claimant first argues that the Commission's original determination that he is entitled to both scheduled PPD benefits pursuant to section 8(e) of the Act and a wage-differential benefit pursuant to section 8(d)(1) of the Act was proper because he injured multiple body parts in different accidents.

¶ 66        We initially observe that where, as here, the circuit court sets aside the Commission's original decision and the Commission enters a new decision on remand, our initial inquiry on appeal from the circuit court order confirming the decision on remand is whether the circuit court erred in reversing the Commission's *original* decision. *Vogel v. Industrial Comm'n*, 354 Ill. App. 3d 780, 785-86 (2005). The determination whether a claimant is entitled to separate awards presents a question of fact. See *Village of Deerfield v. Illinois Workers' Compensation Comm'n*, 2014 IL App (2d) 131202WC, ¶ 44 (observing that a determination as to the type of permanency award requires resolution of factual matters). We review the Commission's factual determinations under the manifest-weight-of-the-evidence standard. *Village of Deerfield*, 2014 IL App (2d) 131202WC, ¶ 44; *Baumgardner*, 409 Ill. App. 3d at 278-79. A finding of fact is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Village of Deerfield*, 2014 IL App (2d) 131202WC, ¶ 44.

¶ 67        In its original decision, the Commission awarded a scheduled PPD award under section 8(e)(10) of the Act for the injury claimant sustained to his right elbow in the first accident, a scheduled PPD award under section 8(e)(9) of the Act for the injury claimant sustained to his right wrist in the first accident, and a wage-differential award under section 8(d)(1) of the Act for the injury claimant sustained to his right wrist in the second accident. As noted, claimant argues that the Commission properly entered separate awards because he suffered multiple injuries to multiple body parts in multiple accidents. We agree with claimant in part.

¶ 68        The outcome of this case is controlled by our decision in *Baumgardner*, 409 Ill. App. 3d 274. In that case, the parties stipulated that the claimant sustained work-related injuries to his right knee in April 1996 and May 1998 and that the condition of ill-being in his right leg was causally related to the injuries sustained on those two dates. The claims were consolidated, and the arbitrator issued a single decision awarding the claimant a wage differential for the duration of this disability pursuant to section 8(d)(1) of the Act. The Commission affirmed the arbitrator's decision with a modification to correct a clerical error. The claimant appealed,

- 12 -

arguing that, in addition to the wage-differential award, he was entitled to a scheduled PPD award under section 8(e)(12) of the Act for the injury he sustained in April 1996. This court affirmed the Commission's decision, holding that its denial of a scheduled PPD award under section 8(e) of the Act was not against the manifest weight of the evidence. *Baumgardner*, 409 Ill. App. 3d at 280-81. In support of our decision, we noted that sections 8(d)(1) and 8(e) of the Act contemplate a single determination as to the permanency of a claimant's condition as a result of an employment accident. See 820 ILCS 305/8(d)(1) (West 2006) (providing that the Commission may award a claimant a wage-differential benefit "except in cases compensated under the specific schedule set forth in paragraph (e) of this Section"); 820 ILCS 305/8(e) (West 2006) (stating in relevant part that a claimant may be granted a scheduled award "but shall not receive any compensation under any other provisions of this Act"). Thus, we held that "where a claimant has sustained *two separate and distinct injuries to the same body part* and the claims are consolidated for hearing and decision, it is proper for the Commission to consider all of the evidence presented to determine the nature and extent of his permanent disability as of the date of the hearing." (Emphasis added.) *Baumgardner*, 409 Ill. App. 3d at 279-80.

¶ 69     Applying the principles of *Baumgardner* to the facts of this case, we find it necessary to analyze separately the injuries to claimant's right elbow and his right wrist. With respect to the right elbow, we conclude that the Commission's original determination that claimant was entitled to PPD benefits under section 8(e)(10) of the Act is not against the manifest weight of the evidence because claimant sustained only one injury to this body part. In this regard, the record establishes that, following the first accident, claimant was diagnosed with a right elbow fracture, right wrist contusion, and right shoulder strain. The Commission found that the elbow healed without complication and awarded PPD benefits for that injury. Although claimant sought compensation for two additional accidents and all three claims were tried together, none of the other accidents involved an injury to claimant's right elbow. Significantly, claimant was diagnosed with a right wrist strain as a result of the second accident and injuries to the shoulders, neck, and back as a result of the third accident. The Commission awarded the wage differential for the injury sustained in the second accident, which, as noted above, involved only claimant's right wrist. As the foregoing demonstrates, the Commission did not award both a scheduled PPD award under section 8(e)(10) of the Act and a wage-differential award under section 8(d)(1) of the Act for the injury to claimant's right elbow. Thus, the Commission's original finding that claimant was entitled to a scheduled PPD award under section 8(e)(10) of the Act for the injury he sustained to his right elbow on October 31, 2005, is not against the manifest weight of the evidence. See *Village of Deerfield*, 2014 IL App (2d) 131202WC, ¶¶ 52-55 (holding that although claims were consolidated for hearing, the Commission properly awarded both a section 8(d)(1) award and a section 8(d)(2) award where the claimant sustained injuries to distinct body parts as a result of successive accidents). Therefore, we reinstate the scheduled PPD award under section 8(e)(10) entered by the Commission in its original decision.

¶ 70     With respect to the right wrist, the record shows that claimant sustained two accidents—one on October 31, 2005, and the other on December 12, 2007. The claims were consolidated for hearing and decision. The Commission awarded both a scheduled PPD award under section 8(e)(9) of the Act and a wage-differential award under section 8(d)(1) of the Act for the injuries to claimant's right wrist. As this court held in *Baumgardner*, however, the plain

- 13 -

language of the Act provides that compensation is proper under either section 8(e) or 8(d)(1), but not both at once. *Baumgardner*, 409 Ill. App. 3d at 279; see also *General Electric Co. v. Industrial Comm'n*, 89 Ill. 2d 432, 437 (1982). Accordingly, in light of the plain language of the Act and our holding in *Baumgardner*, we hold the Commission's original award of a PPD benefit under section 8(e)(9) of the Act for the October 31, 2005, injury to claimant's right wrist is against the manifest weight of the evidence and must be vacated.[2] Since there was sufficient evidence to support a finding that claimant was entitled to a wage-differential award, we affirm that award. *City of Chicago*, 409 Ill. App. 3d at 266.

¶ 71     In short, we hold that claimant is entitled to a scheduled award of PPD benefits pursuant to section 8(e)(10) of the Act for the injury to his right elbow as a result of the October 31, 2005, work accident and a wage-differential pursuant to section 8(d)(1) of the Act for the injuries to his right wrist as a result of the October 31, 2005, and December 12, 2007, work accidents.

¶ 72                                    B. PTD Benefits

¶ 73     Claimant next argues that the Commission erred in not finding him permanently and totally disabled. An employee is permanently and totally disabled if he or she is obviously unemployable, *i.e.*, unable to make some contribution to industry sufficient to justify the payment of wages or there is medical evidence to establish a claim of permanent and total disability. *Sharwarko v. Illinois Workers' Compensation Comm'n*, 2015 IL App (1st) 131733WC, ¶ 53; *Lanter Courier v. Industrial Comm'n*, 282 Ill. App. 3d 1, 10 (1996) (Rarick, J., concurring in part and dissenting in part). However, an employee need not be reduced to complete physical incapacity to be entitled to PTD benefits. *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 286-87 (1983). If an employee's disability is limited and it is not obvious that the employee is unemployable, the employee may nevertheless demonstrate an entitlement to PTD by proving he or she fits within the "odd lot" category. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 544 (2007). The odd-lot category consists of employees who, "though not altogether incapacitated for work, [are] so handicapped that [they] will not be employed regularly in any well-known branch of the labor market." *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 547 (1981) (citing 2 Arthur Larson *et al.*, Workmen's Compensation § 57.51, at 10-164.24 (1980)). An employee generally fulfills the burden of establishing that he or she falls into the odd-lot category in one of two ways: (1) by showing a diligent but unsuccessful search for employment or (2) by demonstrating that because of age,

---

[2] In setting aside in part the Commission's original decision, the circuit court cited both *Baumgardner* and *City of Chicago*, 409 Ill. App. 3d 258. In *City of Chicago*, we recognized that, where a claimant has sustained two separate and distinct injuries to the same body part and the claims are consolidated for hearing and decision, there may be situations that would permit the Commission to delineate and apportion the nature and extent of permanency attributable to each accident. *City of Chicago*, 409 Ill. App. 3d at 265. However, *City of Chicago* involved benefits under sections 8(d)(1) and 8(d)(2) of the Act. In contrast, the benefits at issue in both *Baumgardner* and this case involved sections 8(d)(1) and 8(e) of the Act. And, as noted above, the statutory provisions at issue here contemplate a *single* determination as to the permanency of a claimant's condition where the claimant sustains two separate and distinct injuries to the same body part and the claims are consolidated for hearing and decision. Thus, even if we could delineate a separate condition of ill-being attributable to each accident, the Act would prohibit us from doing so in this case. For this reason, the holding in *City of Chicago* is not applicable here.

training, education, experience, and condition, there are no available jobs for a person in his or her circumstance. *Professional Transportation, Inc. v. Illinois Workers' Compensation Comm'n*, 2012 IL App (3d) 100783WC, ¶ 34; *Alano v. Industrial Comm'n*, 282 Ill. App. 3d 531, 534-35 (1996). If an employee makes this showing, the burden shifts to the employer to show that some kind of suitable work is available to the employee. *Westin Hotel*, 372 Ill. App. 3d at 544. This issue presents a question of fact, which we review under the manifest-weight-of-the-evidence standard. *Professional Transportation, Inc.*, 2012 IL App (3d) 100783WC, ¶ 33. A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Professional Transportation, Inc.*, 2012 IL App (3d) 100783WC, ¶ 33.

¶ 74     In this case, claimant does not argue that he is obviously unemployable, and he cites no medical evidence to establish that he is permanently and totally disabled. Thus, claimant was required to establish that he falls into the odd-lot category. Claimant asserts that he both presented evidence of a diligent but unsuccessful search for employment and established that because of his age, training, education, experience, and condition there are no available jobs for a person in his circumstance. It is undisputed that claimant conducted a job search. Boyd testified that claimant's search involved making at least 10 job contacts per week over several years. According to Boyd, however, the job search was fruitless, yielding very few interviews and no job offers. Steffan confirmed that claimant conducted a multiyear job search under his supervision. During this period of time, claimant made 1100 job contacts but received no job offers. Based on this evidence, we find that claimant established a diligent but unsuccessful job search. Accordingly, the burden shifted to respondent to show that some kind of suitable work is available to claimant. Claimant summarily concludes that respondent did not meet its burden. We disagree. We hold that respondent met its burden by presenting evidence that claimant is employable as a watchman.

¶ 75     In this regard, Steffan testified that claimant had a lifting restriction of 30 pounds occasionally, which would place him at the medium physical-demand level. This is consistent with the restrictions imposed by MercyWorks in September 2011. According to Misch's testimony, the duties of the watchman position fit within these restrictions. Misch testified that no aspect of the watchman position involved lifting over 30 pounds. He also noted that the position does not require any overhead lifting and that the only pushing or pulling would be opening or closing a door. On August 15, 2011, claimant was sent a letter advising that there was a job as a watchman within his restrictions paying $19.24 per hour. The letter indicated that the job offer was contingent upon completion of a "willing and able questionnaire" confirming claimant's readiness to perform the duties of the position. Claimant testified that he did complete the questionnaire as instructed. Pak followed up with claimant at the end of August. At that time, Pak advised claimant that he would be hired for the position once he completed a fingerprinting process. Claimant informed Pak that he would consult with his doctor and attorney but never followed up with Pak.

¶ 76     Claimant denies that there was any actual job offer. However, the Commission is charged with assessing the credibility of the witnesses, resolving conflicts in the evidence, assigning weight to be accorded the evidence, and drawing reasonable inferences from the evidence. *Bolingbrook Police Department v. Illinois Workers' Compensation Comm'n*, 2015 IL App (3d) 130869WC, ¶ 52. The Commission weighed the evidence and determined that claimant was presented with a *bona fide* job offer for the watchman position. This finding is supported

by the testimony of Pak and Misch. This finding is also supported by the fact that claimant informed both Dr. Maday and Boyd that he had been offered a watchman position.

¶ 77    Claimant argues that further proof that he was not offered a watchman job is that respondent continued to pay him full maintenance benefits until May 2012, about nine months after the job offer was allegedly made. However, as claimant readily acknowledges, the voluntary payment of benefits is not an admission of liability. See 820 ILCS 305/8(a), (b)(7) (West 2006); *R.D. Masonry, Inc. v. Industrial Comm'n*, 215 Ill. 2d 397, 408 (2005). Moreover, the record suggests that the parties were engaged in discussions regarding a potential resolution of the status of the watchman position during part of this period. As such, the Commission could reasonably reject this argument.

¶ 78    Claimant also disputes that the watchman position is suitable employment for him. In support of this argument, claimant asserts that Dr. Maday stated that he could not meet the job requirements of a watchman. Dr. Maday prepared a note dated August 26, 2011, indicating that part of the watchman position "required possibility [*sic*] of contact with suspects and possibility [*sic*] of heavy lifting." Dr. Maday's opinion was based on a bid announcement claimant obtained independently online as well as claimant's concern that he would have to confront somebody as part of the watchman duties. As noted above, however, respondent presented testimony from Misch addressing Dr. Maday's concerns about the scope of the watchman position. Misch confirmed that no aspect of the watchman position involved lifting over 30 pounds, overhead lifting, or the physical apprehension of trespassers. Misch noted that if an unauthorized individual is observed on the premises, the watchman is instructed to call 911 and the command center.

¶ 79    Claimant also directs us to Boyd's testimony in support of his contention that he is unable to perform the duties of a watchman. Boyd noted that there is a "wide variance" of what a watchman position requires. Boyd stated that "[r]egardless of the lifting requirement or lack thereof, there were a couple of things on [the] job description that did not jive with the results of [claimant's] vocational testing." This included auditory comprehension, reasoning and problem solving, response to emergency situations, and dealing with multiple variables at the job. However, Steffan testified that claimant was employable and placeable. Further, although Steffan acknowledged that he did not review the job description for the watchman position, he confirmed that such a position would be suitable employment for claimant if the position did not require physical confrontation, had a 30-pound lifting restriction, called for monitoring security footage and walking the premises, and required calling 911 if there was an unauthorized individual on the property. This is consistent with the duties of the watchman position as described by Misch. Again, the Commission weighed the evidence and the credibility of the witnesses and determined that the position of a watchman was suitable for claimant. See *Bolingbrook Police Department*, 2015 IL App (3d) 130869WC, ¶ 52. This finding was not against the manifest weight of the evidence. Accordingly, we affirm the Commission's finding that claimant was not entitled to PTD benefits.

¶ 80                              C. PPD Benefits

¶ 81    Next, claimant argues that the Commission erred in failing to award PPD benefits for the injuries he sustained to his neck and bilateral shoulders as a result of the December 2010 fall. In a workers' compensation case, the employee has the burden of establishing, by a preponderance of the evidence, the extent and permanency of his or her injury. *Chicago Park*

*District v. Industrial Comm'n*, 263 Ill. App. 3d 835, 843 (1994). An employee is entitled to PPD benefits when a work accident leaves him or her "permanently partially incapacitated from pursuing his or her usual and customary employment, and is reasonably certain to permanently prevent the [employee] from earning as much as the [employee] would have earned absent the injury." *DiFoggio v. Retirement Board of the County Employees Annuity & Benefit Fund*, 156 Ill. 2d 377, 379 (1993).

¶ 82    Initially, claimant asserts that, because it is undisputed that he injured his neck and shoulders as a result of his 2010 fall, the Commission's finding with respect to permanency presents a question of law subject to *de novo* review. We disagree. The fact that the accident itself was undisputed does not necessarily mean that the nature and extent of the injured employee's disability was also undisputed. To the contrary, prior to the commencement of testimony in this case, both parties agreed that the issues in dispute with respect to the December 6, 2010, accident were "causation, medical, and *permanency*." (Emphasis added.) The nature and extent of an injured employee's disability is a factual question, the resolution of which is peculiarly in the province of the Commission's expertise, and its determination of the issue will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Illinois Forge, Inc. v. Industrial Comm'n*, 95 Ill. 2d 337, 343 (1983); *Shockley v. Industrial Comm'n*, 75 Ill. 2d 189, 193 (1979). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Westin Hotel*, 372 Ill. App. 3d at 539.

¶ 83    Based on the record before us, the Commission's decision claimant was not entitled to a separate PPD award for the injuries to his neck and shoulders as a result of the December 6, 2010, accident was not against the manifest weight of the evidence. In denying claimant PPD benefits for the December 6, 2010, accident, the Commission relied on the opinion of Dr. Kornblatt. Dr. Kornblatt diagnosed (1) a strain to the bilateral shoulders with preexisting acromioclavicular arthritis and rotator cuff tendonitis, (2) a cervical strain with preexisting cervical degenerative disc disease, and (3) a mild lumbar strain. Dr. Kornblatt opined that only the strains to the bilateral shoulders, cervical spine, and lumbar spine were related to the December 6, 2010, accident. He recommended conservative treatment for these conditions and concluded that claimant would reach MMI after about four weeks of treatment. The record shows that claimant attended several sessions of physical therapy following Dr. Kornblatt's examination. Claimant was released from physical therapy in July 2011. It is true that claimant continued to have bilateral shoulder complaints following his release from therapy. However, given Dr. Kornblatt's opinion regarding the timing of claimant's expected recovery, the Commission could have reasonably concluded that claimant had completely recovered from the work-related injury without any residual disability and that any remaining symptoms were solely the result of his unrelated, preexisting conditions and not the strain caused by the December 6, 2010, accident. Thus, we find no error.

¶ 84                                    D. Penalties and Attorney Fees

¶ 85    Lastly, claimant asserts that he is entitled to penalties and attorney fees pursuant to sections 16, 19(k), and 19(*l*) of the Act (see 820 ILCS 305/16, 19(k), 19(*l*) (West 2006)) for respondent's failure to pay certain medical expenses and maintenance. The intent of sections 16, 19(k), and 19(*l*) is to implement the Act's purpose to expedite the compensation of industrial workers and to penalize employers who unreasonably, or in bad faith, delay or withhold compensation due an employee. *Avon Products, Inc. v. Industrial Comm'n*, 82 Ill. 2d

297, 301 (1980). Awards under section 16 and 19(k) are proper only if the employer's delay in making payment is unreasonable or vexatious. *McMahan v. Industrial Comm'n*, 183 Ill. 2d 499, 504-05 (1998). That is, the refusal to pay must result from bad faith or improper purpose. *McMahan*, 183 Ill. 2d at 515. An award under section 19(*l*) is more in the nature of a late fee, so an award under that section is appropriate if an employer neglects to make payment without good and just cause. *McMahan*, 183 Ill. 2d at 515; *Dye v. Illinois Workers' Compensation Comm'n*, 2012 IL App (3d) 110907WC, ¶ 15. The employer has the burden of showing that it had a reasonable belief that the delay was justified. *Roodhouse Envelope C. v. Industrial Comm'n*, 276 Ill. App. 3d 576, 579 (1995). Whether to impose penalties and attorney fees under the foregoing provisions is a question of fact for the Commission subject to the manifest-weight standard of review. *Residential Carpentry, Inc. v. Illinois Workers' Compensation Comm'n*, 389 Ill. App. 3d 975, 983 (2009). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Westin Hotel*, 372 Ill. App. 3d at 539.

¶ 86    In this case, the arbitrator found that respondent's actions did not rise "to the level of unreasonable or vexation [*sic*]." Thus, she denied penalties and attorney fees. The Commission affirmed and adopted the arbitrator's finding without comment.

¶ 87    Claimant first argues that the Commission erred in failing to award penalties and fees for respondent's failure to pay certain medical expenses. Specifically, claimant alleges that respondent failed to pay $794.66 in expenses billed by Dr. Nagle and $10,040.97 in expenses billed by ATI Physical Therapy.[3] According to claimant, respondent did not present any evidence to justify its failure to pay these bills. Respondent contends that the record demonstrates that the bills in question were paid by claimant's group insurer. We agree with respondent.

¶ 88    At the arbitration hearing, claimant's attorney represented that there remained outstanding two medical bills, one for $794.66 from Dr. Maday and the other for $9346.31 from ATI Physical Therapy. Respondent asserted that $10,040.97 of these bills had been paid through the group medical plan for which it was entitled to a credit under section 8(j) of the Act (820 ILCS 305/8(j) (West 2006)). The parties agreed that respondent should receive a credit for the medical expenses paid by the group insurance. The arbitrator noted that this left only $100 in unpaid out-of-pocket expenses. Both parties again agreed. Thus, only $100 in medical expenses were in dispute. However, in her decision, the arbitrator determined that respondent had paid all reasonable and necessary medical expenses related to all three accidents. The Commission affirmed this finding. Given this record, we cannot say that the Commission's decision not to impose penalties and attorney fees for the nonpayment of medical expenses was against the manifest weight of the evidence.

¶ 89    Claimant further argues that the Commission erred in failing to award penalties and attorney fees due to respondent's failure to pay maintenance benefits without justification for the period from June 4, 2011, through August 19, 2011, and from May 5, 2012, through the date of the arbitration hearing. Again, we disagree. The arbitrator found that neither party presented evidence as to what sums were paid for what benefits. As a result, the arbitrator

---

[3]At the arbitration hearing, claimant represented that the unpaid bills were from Dr. Maday in the amount of $794.66 and ATI Physical Therapy in the amount of $9346.31. We presume that the discrepancies with respect to the payees and bill amounts made on appeal are typographical errors.

found there was no evidence to determine what credits are owed to respondent or what sums had been paid to claimant. In other words, based on the evidence before it, the arbitrator was unable to determine that, in fact, maintenance benefits had not been paid without justification. As noted, the Commission affirmed and adopted this aspect of the arbitrator's decision. Based on the record, we cannot say that the Commission's finding was improper. We note additionally that although respondent ceased paying maintenance benefits on May 5, 2012, it began paying a wage differential at that time. The Commission could have reasonably concluded that respondent's decision to substitute the maintenance benefit for a wage differential did not warrant the imposition of penalties given that respondent made a *bona fide* offer to employ claimant as a watchman.

¶ 90                              III. CONCLUSION

¶ 91       Based upon the foregoing analysis, we (1) reverse that portion of the circuit court's order of February 16, 2016, which set aside that portion of the Commission's original decision awarding claimant scheduled PPD benefits pursuant to section 8(e)(10) of the Act as a result of the injury to claimant's right elbow on October 31, 2015, and a wage differential pursuant to section 8(d)(1) of the Act as a result of the December 12, 2007, accident; (2) vacate that part of the Commission's decision on remand vacating the scheduled PPD benefits awarded under section 8(e)(10) of the Act as a result of the October 31, 2015, accident; (3) vacate that portion of the circuit court's order of September 12, 2017, which confirmed that portion of the Commission's decision on remand vacating the scheduled PPD benefits awarded under section 8(e)(10) of the Act as a result of the October 31, 2005, accident; (4) reinstate that portion of the Commission's original decision awarding claimant a scheduled PPD benefit pursuant to section 8(e)(10) of the Act for the injury to claimant's right elbow as a result of the October 31, 2005, accident; and (5) affirm the circuit court's order of September 12, 2017, in all other respects.

¶ 92       Affirmed in part, reversed in part, vacated in part, and Commission's original decision reinstated in part.